### CENTRAL COAL & COKE CO. et al. v. HARTMAN.

(Circuit Court of Appeals, Eighth Circuit. September 30, 1901.)

#### No. 1,490.

1. MONOPOLIES—COMBINATIONS IN RESTRAINT OF TRADE—DAMAGES.

Only actual damages, established by the proof of facts from which they may be rationally inferred with reasonable certainty, are recoverable. Speculative, remote, or contingent damages cannot form the basis of a lawful judgment.

2. SAME—SPECULATIVE DAMAGES—EVIDENCE—SUFFICIENCY.

The estimates, speculations, or conjectures of witnesses unfounded in the knowledge of actual facts from which the amount of the damages could have been inferred with reasonable certainty will no more sustain a judgment than the conjectures of a jury.

3. SAME—ANTICIPATED PROFITS—WHEN RECOVERABLE.

The general rule is that the anticipated profits of a commercial business are too remote, speculative, and dependent upon changing circumstances to warrant a judgment for their loss. There is an exception to

this rule that the loss of profits from the interruption of an established business may be recovered where the plaintiff makes it reasonably certain by competent proof what the amount of his actual loss was.

4. SAME—PROFITS OF ESTABLISHED BUSINESS—EVIDENCE—INDISPENSABLE TO RECOVERY.

Proof of the expenses and of the income of the business for a reasonable time anterior to and during the interruption charged, or of facts of equivalent import, is indispensable to a lawful judgment for damages for the loss of the anticipated profits of an established business.

5. SAME—LOSS OF PROFITS.

The plaintiff testified that the acts of the defendants had greatly diminished his business, prevented him from making contracts for future delivery of coal, and diminished his sales from 15 to 20 carloads per month, on which he would have made a profit of from $12 to $20 per car; that he could not tell what the volume of his business was before or after the acts complained of, and that he had no books or papers which would show this fact. He produced no evidence of the expenses or income of his business before or after the acts complained of. *Held*, that the evidence was insufficient to sustain a verdict for damages for the loss of anticipated profits.

(Syllabus by the Court.)

In Error to the Circuit Court of the United States for the Western District of Missouri.

W. C. Perry (Daniel B. Holmes, Adiel Sherwood, and John O'Grady, on the brief), for plaintiffs in error.

Charles H. Nearing (J. S. West and J. B. Campbell, on the brief), for defendant in error.

Before SANBORN, Circuit Judge, and ADAMS and LOCHREN, District Judges.

SANBORN, Circuit Judge. This was an action brought by Samuel Hartman against the Central Coal & Coke Company and several other corporations for three times the damages which he claimed that the defendants had inflicted upon his business by their violation of the inhibitions of the act to protect trade against unlawful combinations and monopolies, commonly called the "Sherman Anti-Trust Law" (26 Stat. 209, c. 647). His complaint was that he had been engaged in the sale of coal in Kansas City, in the state of Kansas, since 1893; that in September, 1896, he and the defendants had formed a coal club to establish and control the prices at which coal should be sold in Kansas City, Kan., and Kansas City, Mo., and to restrain commerce among the states; that they had accomplished their purpose; that he withdrew from the club in 1897; that thereafter the defendants and their associates would not sell him Salt Fork coal or Cherokee coal at any other prices than those which they had established for the sale of coal at retail to consumers; that this action of the defendants caused him a loss of all his trade in Salt Fork coal, of a large portion of his business in Cherokee coal, and made it impossible for him to make contracts for the future delivery of coal, because he was uncertain whether or not he could obtain it; so that he suffered damages in the sum of $2,500. The defendants denied these averments, and at the close of the trial the jury found that the plaintiff's damages were $130, and judgment was thereupon rendered

111 F.—7

against the defendants for three times this amount, $500 attorney's fees, and the costs of the action.

The assignment of errors challenges rulings of the court upon the construction of the act of congress upon the nature and extent of interstate commerce, and upon the sufficiency of the evidence of damages to warrant a verdict against the defendants. If no real legal injury was proved in this case, if there was actually no subject of this controversy, if this is really nothing but a moot case, any opinion we might render upon the grave questions relating to the construction of the act of congress and the character and extent of commerce among the states would be mere obiter dicta, and any discussion or decision of these questions in this action would be useless. For this reason the sufficiency of the evidence of damages to sustain the verdict will first be considered. The only damages claimed in the petition, and the only losses which the plaintiff sought to prove at the trial, were the loss of some of the expected profits of his business of buying and selling coal between January 1, 1897, and January 25, 1899. Compensation for the legal injury is the measure of recoverable damages. Actual damages only may be secured. Those that are speculative, remote, uncertain, may not form the basis of a lawful judgment. The actual damages which will sustain a judgment must be established, not by conjectures or unwarranted estimates of witnesses, but by facts from which their existence is logically and legally inferable. The speculations, guesses, estimates of witnesses, form no better basis of recovery than the speculations of the jury themselves. Facts must be proved, data must be given which form a rational basis for a reasonably correct estimate of the nature of the legal injury and of the amount of the damages which resulted from it, before a judgment of recovery can be lawfully rendered. These are fundamental principles of the law of damages. Now, the anticipated profits of a business are generally so dependent upon numerous and uncertain contingencies that their amount is not susceptible of proof with any reasonable degree of certainty; hence the general rule that the expected profits of a commercial business are too remote, speculative, and uncertain to warrant a judgment for their loss. Howard v. Manufacturing Co., 139 U. S. 199, 206, 11 Sup. Ct. 500, 35 L. Ed. 147; Cincinnati Siemens-Lungren Gas Illuminating Co. v. Western Siemens-Lungren Co., 152 U. S. 200, 205, 14 Sup. Ct. 523, 38 L. Ed. 411; Trust Co. v. Clark, 92 Fed. 293, 296, 298, 34 C. C. A. 354, 357, 359; Simmer v. City of St. Paul, 23 Minn. 408, 410; Griffin v. Colver, 16 N. Y. 489, 491, 69 Am. Dec. 718. There is a notable exception to this general rule. It is that the loss of profits from the destruction or interruption of an established business may be recovered where the plaintiff makes it reasonably certain by competent proof what the amount of his loss actually was. The reason for this exception is that the owner of a long-established business generally has it in his power to prove the amount of capital he has invested, the market rate of interest thereon, the amount of the monthly and yearly expenses of operating his business, and the monthly and yearly income he derives from it for a long time before, and for the time during the interruption of which he complains. The interest

upon his capital and the expenses of his business deducted from its income for a few months or years prior to the interruption produce the customary monthly or yearly net profits of the business during that time, and form a rational basis from which the jury may lawfully infer what these profits would have been during the interruption if it had not been inflicted. The interest on the capital and the expenses deducted from the income during the interruption show what the income actually was during this time; and this actual net income, compared with that which the jury infers from the data to which reference has been made the net income would have been if there had been no interruption, forms a basis for a reasonably certain estimate of the amount of the profits which the plaintiff has lost. One, however, who would avail himself of this exception to the general rule, must bring his proof within the reason which warrants the exception. He who is prevented from embarking in a new business can recover no profits, because there are no provable data of past business from which the fact that anticipated profits would have been realized can be legally deduced. 1 Sedg. Dam. § 183; Red v. City Council, 25 Ga. 386; Kenny v. Collier, 79 Ga. 743, 8 S. E. 58; Greene v. Williams, 45 Ill. 206; Hair v. Barnes, 26 Ill. App. 580; Morey v. Light Co., 38 N. Y. Super. Ct. 185. And one who seeks to recover for the loss of the anticipated profits of an established business without proof of the expenses and income of the business for a reasonable length of time before as well as during the interruption is in no better situation. In the absence of such proof, the profits he claims remain speculative, remote, uncertain, and incapable of recovery. In Goebel v. Hough, 26 Minn. 252, 258, 2 N. W. 847, 849, the supreme court of Minnesota said:

"When a regular and established business, the value of which may be ascertained, has been wrongfully interrupted, the true general rule for compensating the party injured is to ascertain how much less valuable the business was by reason of the interruption, and allow that as damages. This gives him only what the wrongful act deprived him of. The value of such a business depends mainly on the ordinary profits derived from it. Such value cannot be ascertained without showing what the usual profits are."

The truth is that proof of the expenses and of the income of the business for a reasonable time anterior to and during the interruption charged, or of facts of equivalent import, is indispensable to a lawful judgment for damages for the loss of the anticipated profits of an established business. Goebel v. Hough, 26 Minn. 252, 256, 2 N. W. 847; Chapman v. Kirby, 49 Ill. 211, 219; 1 Sedg. Dam. § 182; Ingram v. Lawson, 6 Bing. N. C. 212; Shafer v. Wilson, 44 Md. 268, 278.

Did the plaintiff make any proof of this character at the trial below? The only evidence he offered relating to the damages which he claimed was his own testimony, and he directed this to four elements of injury which he evidently thought tended to show loss of profits, viz. loss of customers, diminution of supply of coal, decrease of volume of business, and the amount of his anticipated profits on sales that he did not make. According to his testimony, he had been in the business of buying and selling coal at Kansas City since 1893. He became one of the board of control of the coal club in 1896, and

withdrew from it in 1897. After his withdrawal he could not procure two kinds of bituminous coal known as "Salt Fork coal" and "Cherokee coal" unless he paid for it a price only 50 cents a ton less than the price to the consumers, notwithstanding the fact that the retail dealers who were members of the club could buy this coal at a price about $1.25 per ton less than the price to the consumers. The reason why he could not buy this coal at the same rate as the members of the club was that they controlled the coal and its price, and they would not sell it to him at that price. His only testimony as to his loss of customers was that before he left the club he could and did make contracts for the future delivery of this coal; that after he withdrew he did not dare to do so, because he did not know that he could secure it; that there was some trade that would come to him for certain grades of coal; that he could not give these grades to those who came; that they did not want to come back, because they did not know whether they could get the coal or not; that his contract business on car-load lots before he withdrew from the club was one or two car loads a month, and that he did not know what it was on wagon loads. He produced no contracts he had ever made. He named no customer with whom he had ever had a contract, no customer whom he had lost. He did not testify how many customers had left him, nor the amount of coal which any or all of them had been accustomed to buy during the years from 1893 to 1897, when he had beeen receiving all this coal which he wished to procure. Here are no facts—no data—from which the number of customers or the amount of custom which he had lost can be lawfully inferred, none which make the amount of the contracts for future delivery which he did not make either reasonably or unreasonably certain, no basis for even a fair conjecture. He testified that he did not know himself what his customary contract business was and he produced no evidence from which the jury could learn. As to his transactions in Salt Fork and Cherokee coal, he testified that before he left the association he was selling from two to three car loads of Salt Fork coal per week during the winter time, and that this was the biggest part of his business,—nearly half of it. But, when the account books of the corporation from which he bought this coal were produced, they disclosed the fact that he purchased only four car loads during November and December, 1896, and only four car loads between December, 1896, and August, 1897, and he admitted that this might be a true statement of the amount of this coal which he handled during that winter, and he produced no books of account, no bills, no checks, no other evidence to explain the wildness of his conjecture that his business in this coal the winter before its interruption was from 26 to 39 car loads, when in fact it did not exceed 8. He testified that after he left the club he had a hard time to get Cherokee coal, but that he got some through other dealers, and that his business in this coal was two or three cars a week in the winter before he withdrew. But he produced no evidence to verify this statement, and no proof of the amount of the decrease of this business, if any, caused by the action of the club. There is no evidence in the record that the coal club in any way diminished his trade in any other coals

than the Salt Fork and the Cherokee. The plaintiff testified that their action did not disturb his trade in the anthracite and semi-anthracite coals, and that his business in these increased after the interruption of his trade in the Salt Fork and Cherokee. As to the volume of his general business and its decrease he testified that the better grades of coal he handled were in the association, and his failure to get them caused his business to run down so that he had hardly any; that he had only one grade of coal one winter; and that he could not do business after he left the club as he could the winter before. But he produced no evidence of the volume of his business, of its income, or of its expenses before or after the interruption. The only evidence he produced as to his expected profits was his own testimony that his ordinary profit on a car load of coal was from $12 to $20, and that he had his own place of business and his own teams. But the evidence disclosed the fact that this $12 to $20 was the difference between the amount he paid for a car load of coal and the amount which he retailed it for, and that it would be necessary to deduct from this alleged profit the proper proportion of the expenses of hiring the teamsters, maintaining the teams and the office, handling the coal, and operating the business, before the actual profit could be ascertained; and there was no evidence of the amount of these expenses. The plaintiff testified that he kept a ledger, in which he entered the charges of coal sold on credit, and that he had a bank account and a bank book, but he said that he had no books that would show how much coal he handled before or after the interruption, and he did not produce either his ledger or his bank book. Here are a few extracts from his testimony on cross-examination:

"Q. Now, you can't give us any details as to the amount your business was damaged, can you? A. Yes, I think I can make an estimate that it was three or four cars a week less during the season. Q. That would be your estimate? A. Yes, sir. Q. But you can't tell these gentlemen how many cars you handled less after that than you did handle while you were a member of the association, or before you were a member? A. Well, it would run between twelve and fifteen cars a month. * * * Q. And you can't tell the jury the number of cars of coal that you handled in 1898? A. No, sir. Q. All that you can say is that you think it is a little less than it was in the year 1896? A. Yes, sir. Q. But how much less you can't tell? A. No, sir. * * * Q. You haven't got any account, or any paper, or any book, or anything on earth to show how much you took in, or how much your expenses were, or how much you had to pay for your coal? A. I haven't got it here, but I expect I could come pretty near telling you what it was. Q. You haven't even got your cash book, to show how much you took in in any given time, have you? A. No, sir. Q. Or your journal to show how much you paid out? A. No, sir. Q. You haven't got any record to show how much coal you bought, or who you got it from, or when it was received? A. No, sir. * * * Q. Then you can't give any information from your books as to the amount of Cherokee coal you handled? A. No, sir. Q. And the same is true as to all other coal you have handled? A. Yes, sir. Q. So we will just have to take your word for it? A. Yes, sir. Q. Haven't you got a bank book? A. Yes, sir. Q. Where is that? A. It is over in my office. Q. Haven't you got the [weigh bills] for your coal? A. I had them, but I destroyed them. Q. Haven't you got those in 1898, when you thought about commencing this suit? A. I may have; but I didn't look after that part of the business. Q. Then the result of it all is that, so far as the extent of your business is concerned at any time, we can't get any light as to that from any books you kept? A. No, sir; not even from my check books and bank books. I don't keep them."

These excerpts from the testimony demonstrate the fact that the basis of this judgment is nothing but the mere guess of an interested witness. Litigants cannot be permitted to estimate the money out of the coffers of their opponents in this reckless way. This plaintiff first estimated that he had lost the sale of from 9 to 13 cars of Salt Fork coal per month during the winter season after he withdrew from the club, and the same number of cars of Cherokee coal, or in the aggregate from 18 to 26 cars per month. On cross-examination he guessed again, and estimated that his loss was only from 12 to 15 cars a month. When the books of the Salt Fork Coal Company were produced, and showed that his purchases of that coal in the winter of 1896 had averaged less than 2 cars per month, he conceded that this might be correct, and that he might have overestimated his trade in this coal before he withdrew from the association at least 300 per cent.; that he had guessed 9 to 13 cars per month, when it was only 2. Testimony of this character is nothing but conjecture, and it presents no substantial evidence to make certain the profits that were lost, if any. Expected profits are, in their nature, contingent upon many changing circumstances, uncertain and remote at best. They can be recovered only when they are made reasonably certain by the proof of actual facts which present data for a rational estimate of their amount. The speculations and conjectures of witnesses who know no facts from which a reasonably accurate estimate can be made form no better basis for a judgment than the conjectures of the jury without facts. The plaintiff in this case had his bank account at his command, which would certainly have given him some indication of the volume of his business before and after the interruption of which he complained. He had his ledger, in which he testified that he had entered the charges of the coal which he had sold on credit. The bank account and the ledger account together, if properly kept, would have given at least an approximate statement of the value of the coal which he handled, because one would have shown his cash receipts, the other his charges for coal sold on credit, and the payments he received for that coal, and a careful comparison of the two would have enabled any intelligent bookkeeper to at least approximate the value of his business. These books were not produced. The indispensable facts to warrant a recovery of the expected profits of an established business were not established. There was no evidence of the amount of capital in the business, of its expenses or of its income, either before or after its interruption. There, were no data for a rational estimate of the profits at any time during the continuance of the business; nothing from which the jury could reasonably infer that the business was profitable before, less profitable or profitless after, the plaintiff's withdrawal from the club. Much less were there any facts established which made the amount of the expected profits lost reasonably certain. The interested witness who alone estimated this loss himself testified that he knew no facts from which a rational finding could be made, and his testimony shows that his estimates were nothing but the wildest conjecture. The result is that the verdict is a speculation of the jury, based on the conjectures of an interested witness, unsupported by the proof, or the

knowledge of any facts from which the plaintiff's loss, or its amount, could lawfully or rationally be inferred, and it cannot be sustained.

The conclusion which has already been reached upon the sufficiency of the evidence of damages to sustain the verdict renders it both unnecessary and unwise to consider or discuss the other questions in this case. The nature of the evidence of damages introduced and withheld by the plaintiff renders it improbable that it will ever be necessary to consider the other issues of law which counsel have discussed.

The judgment below is reversed, and the case is remanded to the court below, with instructions to grant a new trial.