### SUSSEX LAND & LIVE STOCK CO. v. MIDWEST REFINING CO.

(District Court, D. Wyoming. January 11, 1922.)

No. 1139.

1. **Nuisance ⊜⊸9—Action maintainable against any joint tort-feasor.**

Where there are joint tort-feasors and a continuing trespass in the nature of a nuisance is maintained, an action will lie against any one of the tort-feasors who helps to maintain the nuisance.

2. **Damages ⊜⊸40(3)—Prospective profits recoverable for damage to going business if proven with reasonable certainty.**

The damage to a going business by another either on account of negligence or the commission of a continuing trespass may be the loss of prospective profits, providing they are proved with reasonable certainty so as to take them out of the realm of speculation, uncertainty, and remoteness.

⊜⊸For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3. **Damages ⚖190—Evidence insufficient to show loss of prospective profits from damage to pasture land by oil.**

In an action for damages to a rancher's business caused by defendant's acts in allowing oil to escape from its wells into a stream from which in times of overflow it was carried upon plaintiff's land and deposited upon the grass, damaging the pastures, evidence failing to show plaintiff's profits before the damage as compared with his profits after the damage *held* insufficient to justify an award for loss of prospective profits.

4. **Waters and water courses ⚖76—Measure of damage for injury to land by oil escaping into stream depends upon individual case.**

In actions for damage to pasture lands caused by oil escaping into a stream and carried over the lands upon the overflow of the stream, whether the measure of damages is to be based upon the usable value of the lands as measured by loss of profits or upon the rental value of the land must be determined by the circumstances of the individual case.

5. **Waters and water courses ⚖76—Measure of damages for injury to pasture land by oil held rental value.**

In action for damage to plaintiff's pasture lands through the acts of defendant in allowing oil to escape into a stream from which it was carried over the lands at times of flood, the proper measure of damages was the rental value of the land.

6. **Waters and water courses ⚖77—Evidence held admissible to determine proper measure of damages.**

In a suit in equity involving claim for damages to plaintiff's pasture lands caused by defendant's acts in allowing oil to escape into a stream from which it was carried over the land at time of flood, evidence as to loss of prospective profits and as to the fair rental value was admissible, since the proper rule of damages is not determinable until all evidence both as to damages to profits and as to rental value has been introduced.

7. **Waters and water courses ⚖77—Evidence as to damage to defendants from issuance of injunction held proper.**

In action for damages to plaintiff's pasture land by escaping oil and for an injunction, evidence as to the injury which would ensue to defendant from the issuance of an injunction restraining his operations in the oil field was admissible on the question of whether or not an injunction should issue.

8. **Injunction ⚖208—Issuance of writ conditioned on defendant's failure to pay damages.**

A decree may provide that if the party against whom damage is found to have been committed shall pay that damage an injunction will not issue but if such party neglects or fails to pay the damage assessed, an injunction will issue.

9. **Evidence ⚖359(3)—Pictures inadmissible in absence of showing of similar circumstances.**

In an action for damages to plaintiff's pasture lands through defendant's acts in allowing oil to escape into a stream from which it was carried over the lands at time of overflow, pictures of oil field *held* not admissible where it did not appear that conditions surrounding operations in the field were similar to those surrounding the operations in the field where the damage occurred.

In equity. Action by the Sussex Land & Live Stock Company against the Midwest Refining Company for damages and for an injunction. Decree for plaintiff, with provision for an injunction, if payment not made.

George L. Nye, John H. Fry, and A. E. Ryman, all of Denver, Colo., for plaintiff.

John D. Clark, of Denver, Colo., A. C. Campbell, of Cheyenne, Wyo., and Frederick D. Anderson, of Denver, Colo., for defendant.

KENNEDY, District Judge. This action is brought by the plaintiff against the defendant upon the theory that the defendant has committed and is committing a continuing trespass, which amounts to a nuisance, in permitting oil from wells in the Salt Creek oil field operated by defendant to find its way into Salt creek and, upon occasion of floods in that creek, to overflow with the water upon plaintiff's pasture lands, damaging these lands for use by plaintiff in its live stock operations.

In its complaint a permanent injunction is sought against the defendant by which the defendant would be enjoined from permitting the escape of the oil in the manner indicated and a prayer for the damage suffered by the plaintiff on account of the oil going upon plaintiff's lands.

A motion to dismiss was interposed by the defendant in which the cause of action of plaintiff as set out in the complaint is challenged, which motion was overruled by the court. Judge Riner in overruling the motion relied upon the rule laid down in Arizona Copper Co. v. Gillespie, 230 U. S. 46, 33 Sup. Ct. 1004, 57 L. Ed. 1384.

The defendant then interposed an answer to the complaint, in which its defenses may be substantially described as denying the allegations of the complaint as to the escape of any substantial quantity of oil upon plaintiff's lands; the denial of any damage in consequence of the escape of any such oil; that the damage, if any, was caused by the natural escape of oil not within the control of the defendant; that the damage, if any, from the escape of oil in the manner set forth in the complaint, was largely contributed to by other parties than the defendant; that the oil field, so far as the defendant was concerned, was operated through modern, scientific, and best-known methods which should in law relieve the defendant of any damage incurred by plaintiff on account of the escape of oil; and that if damage were caused through the operation of the oil field by defendant in the manner indicated, in any event an injunction should not issue, on account of the public welfare, including the vast amount of money involved, the great number of employees engaged in the enterprise, and the life and prosperity of entire communities being largely dependent upon the continued operation of the field.

Upon the trial of the cause application was made to amend the answer by including another defense which would limit any damages to a period of four years immediately preceding the commencement of the action, which amendment was allowed by the court, and the case was tried upon this theory, approved by both plaintiff and defendant, that no damage prior to four years before the filing of the complaint on August 4, 1920, should be considered; and all evidence introduced tending to show conditions pertinent to the issue prior to that date was admitted by the court upon the theory that it was of an historical value and neces-

sary in order to get the entire condition surrounding the operation of the oil field, and the operation of the stock business by plaintiff, before the court, without, however, being used as a basis for fixing damages accruing to the plaintiff prior to the date mentioned.

At the close of plaintiff's testimony a motion was made to amend the complaint by increasing the damages sought so as to make the pleadings conform to the proof, which amendment was allowed by the court and which increased the prayer for damages from $126,000 to approximately $222,140.

The record in the case is voluminous, as practically three weeks were consumed in the trial, and many witnesses examined by both plaintiff and defendant tending to establish the respective points contended for in the pleadings.

It would be impracticable in this memorandum to review at length the testimony offered and also unnecessary in some respects, considering the court's view of the proper analysis of the evidence and its weight and materiality as considered by the rules of law which would seem to govern the issues in the case.

Accordingly, the first question to be determined, whether with a view of fixing damages or granting an injunction, is: Was the plaintiff damaged? An analysis of the testimony upon this point discloses that the plaintiff is possessed of a certain ranch located near the junction of Salt creek with Powder river, in the county of Johnson in the state and district of Wyoming. The holdings of the plaintiff for the purposes of discussing the issues of this case may be divided into two parcels. One parcel may be described as what is known and referred to in the evidence as the Salt Creek pastures, consisting of approximately 1,800 acres, and the other parcel as lands of the plaintiff lying north of the Salt Creek pastures along Powder river, comprising approximately 2,500 acres. The damages sought by plaintiff in this action are confined exclusively to the Salt Creek pastures, except as these pastures may have a certain bearing and value when used in connection with the other holdings of the plaintiff and the outside public domain.

The Salt Creek pastures extend from the mouth of Salt creek as it empties into Powder river south, up and along Salt creek for a distance of seven or eight miles. These pastures consist both of deeded and leased lands, occupied and in the possession of the plaintiff. The lands are not, however, in a solid block as it were, but are apparently taken up so as to follow the course of the stream, as near as may be, and at all times give the plaintiff access to the waters of the stream and the low lands adjacent thereto.

The stream known as Salt creek is exceedingly tortuous in running through the territory above described, and is intermittent in its flow — that is to say, that during certain periods of the year there is no flowing stream of water down Salt creek, but during these periods the evidence discloses there are certain pools of water lying in the bed of the creek which may be available for stock watering purposes. At certain other periods of the year, during the spring months, there is a continuous flow of the stream for a limited period caused by the spring floods and melting snows, and at still other periods, on ac-

count of exceedingly heavy rains or cloud-bursts, there are so-called flood seasons during which the stream overflows its banks throughout almost the entire length, and particularly at the point or points known as the plaintiff's Salt Creek pastures.

What is known in this case as the Salt Creek oil field is located some 20 miles south and up Salt creek from the point where it empties into Powder river. This oil field has developed during a period of approximately ten years to one of the greatest oil fields in the world to-day. For a distance of several miles Salt creek flows through the heart of this field. Beginning with the year 1911 there has been a continuous, active development of the field which is still very largely in progress. The area of the field is exceedingly rough and broken as to topography throughout its entire extent, being cut not only by Salt creek but by other creeks, gulches, and draws, all of which drain as a rule into Salt creek. Prior to the year 1910 there had been some evidence of oil upon the waters of Salt creek, but there was no oil of a substantial quantity prior to the operation of the field upon a larger scale, beginning about the year 1911. There is also evidence of some oil springs in or near the bed of Salt creek which had been seeping oil for a number of years, and which undoubtedly led to the after-discovery of the large pool underlying the Salt Creek structure. The seep or flow of oil from these springs and crevices prior to the major operations in the field was exceedingly small, and the evidence discloses that this was not sufficient in amount to cause any particular damage on account of being carried upon the surface of the stream.

At this point, in considering whether or not the plaintiff has been damaged, it might be well to distinguish the element of damage, if any, in this case, as compared with the damage outlined in the majority of overflow cases found in the books. In this vast majority of overflow cases, whether from the erection of dams, smelters, or other processes of manufacture, the damage is caused by débris or a foreign substance created by the plant or dam being flooded upon the land and thereby causing it permanent injury. In the case at bar the element of damage contended for is entirely different. It is not claimed, as the court analyzes the evidence, that on account of the oil overflowing upon the lands of the plaintiff there is created a permanent damage to the land. Salt creek has uniformly overflowed its banks long before there were any operations in the Salt Creek oil field, and before and since that operation these floods have uniformly carried silt, sand, and débris over and upon the Salt Creek pastures. The element of damage claimed by plaintiff is that with a flood of Salt creek over its banks and upon the Salt Creek pastures of plaintiff there has been carried an immense quantity or coating of oil which, when the waters recede and find their way again into the creek, is left upon the grass and other vegetation, injuring it and making it undesirable and unusable for stock feeding purposes; that at some points pools of oil are left in the low depressions which it becomes necessary to burn and which burning retards the growth of the grass for an unnatural period of time. There is an additional claim by plaintiff that the heavy coating of oil at different periods upon the surface of the stream, when it does not overflow its

banks, damages the stock of plaintiff, in that it adheres to the wool of sheep, udders of cows, and legs and sides of the horses, causing some irritation and affecting the salable quality of the wool. There is likewise some testimony tending to establish the effect of the oil being drunk by the live stock in the Salt Creek pastures, in that it had a tendency to cause diarrhea in some animals; but there was likewise stronger evidence that the alkali, admitted to be in the waters of Salt creek, produced even more pronounced results along this line than did the oil, so that this particular element of damage, in the opinion of the court, cannot well be considered as sustained by the evidence, especially in view of the fact that no item of particular damage, or rather the proof of it, was offered by the plaintiff upon the trial. This may likewise be stated as the fact with reference to the oil in the creek adhering to the animals and the wool of the sheep, for the plaintiff offered no evidence tending to prove damage in dollars and cents along this line.

The damage therefore to be considered for the purposes of deciding this case, both as to the quantity of damages and the injunction, will necessarily be limited to the damage caused to the Salt Creek pastures as pasture land.

I think it may be considered as proven from not only the testimony of plaintiff's witnesses, but from that of defendant, that large quantities of oil have at certain periods escaped into Salt creek and have been carried down that stream and in flood seasons, over and upon the lands of the plaintiff. Undoubtedly this oil in the nature of things adhered to trees, brush, vegetation, and grass for a longer or shorter period. It is true that the evidence is much in dispute as to what effect this oil had upon the grass in these pastures, available for the feeding of live stock. Some witnesses have testified that the oil so adhered to the grass that it left a kerosene taste and smell, so that live stock would not eat it unless in a more or less starving condition. On the other hand, witnesses have testified that they have repeatedly inspected the grass within the pastures, and that it had no such smell or taste as claimed for it by the plaintiff, and that stock of various kinds had been seen feeding in the pastures during the period for which plaintiff claims damage. The matter of the pools of oil being deposited in the low places is not largely in dispute from the evidence, as it is admitted that these pools have been found and have been burned at various places in the pastures, and I believe it may be considered as fairly well established that the burning of these pools of oil, if in places where grass has previously grown, would retard the growth of that grass. It is manifestly a fact that a highly inflammable material like oil would create a fire more intense when applied to the soil than would a fire which would consume merely the inflammable grass and vegetation naturally growing there. The photographs introduced in evidence show that the oil has adhered to trees and other vegetation as well as the grass suitable for grazing purposes, and undoubtedly would leave, at least upon occasions, its distasteful substances. It may therefore be considered as proven in this case that the plaintiff was damaged by the oil carried upon its lands by Salt creek during the flood seasons, but the

measure of that damage will necessarily have to be deferred in its determination until the next question in the logical pursuit of the real issues in this case can be determined.

The question is: Did the defendant cause the damage suffered by the plaintiff?

A general outline of the location of the Salt Creek oil field and the development of the operations in this field have already been touched upon. The operations, as before stated, began in their more intensified form about the year 1911. It was not, however, until the year 1914, that the defendant company took over the operations in that field. From the year 1914 up to the present time those operations have been continually increased each year, there being a substantial number of wells drilled, some by the defendant and others by independent companies. The testimony, however, discloses that the chief operations in the oil field during the period since 1914 to the present time have been by the defendant company, and while a considerable number of wells have been drilled by independent companies the operation of these have largely been taken over by the defendant company. In other cases the wells are operated by independent companies and the product disposed of to the defendant company. This was necessarily the case owing to the fact that the defendant company owned and operated the only carrying pipe lines for the disposition of the product of the field to the refineries located at Casper, a distance of approximately 40 miles. The court has not attempted to establish the percentage of the entire number of wells in the field operated by the defendant company and that operated by the independent companies, as it would seem immaterial for the purposes of this case to establish this exact ratio. Suffice it to say that perhaps as high a percentage as 90 per cent. of the wells in the field are operated by the defendant company. From the defendant's own admissions the oil produced from the field from its operation has increased from 2,300,000 barrels in 1914 to 8,600,000 barrels in 1920.

There has been a vast amount of evidence introduced on behalf of the defendant tending to show that the oil fields, so far as this defendant is concerned, have been, at least since the commencement of this action, operated under the latest approved methods, and that the best-known methods in preventing the loss of oil have been employed. Nevertheless, during the shooting of wells in close proximity to Salt creek, or any of its tributaries, some oil was necessarily lost. Likewise, regardless of the effects of the defendant to prevent loss, with the construction of reservoirs and sumps, during the period of heavy rains and cloud-bursts, the reservoirs necessarily washed out and broke, thereby causing a loss of some oil which, on account of the topography of the country, drained into Salt creek; but as to the quantity of this lost oil the plaintiff and defendant are far from being in harmony.

With this brief suggestion of the trend of the testimony, considering the intense operation of the defendant company as compared with other operators, taking into consideration the increased oil upon the stream as the operations have developed, the evidence leads the court to the conclusion that the damage suffered by the plaintiff has been caused chiefly by the operation of the defendant.

If the theory of the plaintiff is correct in this case, that the action is based upon a continuing trespass, which amounts to a nuisance, and which theory we are bound to adopt upon the previous ruling of the court in overruling the motion to dismiss upon the ground that the complaint did not state sufficient facts to constitute a cause of action, in which ruling, I state in passing, I concur, then the conclusion reached by the court at this point is that the damage to the plaintiff, so far as fixing responsibility in this case is concerned, was caused by the defendant.

[1] The point discussed upon the arguments as to whether or not there are other defendants contributing to that damage has been disposed of by the courts in this kind of a case. Where there are joint tort-feasors and a continuing trespass in the nature of a nuisance is maintained, an action will lie against any one of the tort-feasors who helped to maintain the nuisance. City of Cushing v. High (Okl.) 175 Pac. 229. Other authorities have been cited, but it is such a well-settled proposition of law that it will not be considered necessary to dwell upon it for the purpose of deciding this case.

We must now revert to the damage alleged to have been suffered by the plaintiff, which has already been discussed but only in so far as it tends to establish damage suffered, which may be merely nominal or substantial, damages for which plaintiff has an adequate remedy at law, or great and irreparable, so as to influence the court in first fixing that damage and then applying the rule governing injunctions in cases of this nature.

The next question therefore to be decided is the amount of damage in dollars and cents suffered by plaintiff, which leads us, in the opinion of the court, to the most important question in the case. What is the proper measure of damages and the proof sustaining that measure to be adopted in this case?

Two distinctly different rules have been suggested by the parties to govern, first the introduction of testimony, and then the sufficiency of the testimony to bring it within the rule.

The plaintiff earnestly contends that the measure of damage is the usable value of the Salt Creek pastures to the plaintiff, and under this rule that this usable value is measured by the loss of profits which it is alleged the plaintiff suffered on account of the action of the defendant in permitting oil to escape and flow upon the pastures. Defendant contends that the measure of damages is the rental value of the lands in controversy. Objections were made by the defendant to the introduction of testimony by plaintiff upon plaintiff's theory of the proper rule governing the measure of damages, and the plaintiff objected to the introduction of testimony by defendant under its theory of the proper rule as outlined above. In order to conserve time, and particularly the time of numerous witnesses in waiting, so that an argument might not be necessary upon the point during the trial, the ruling of the court was reserved on both objections and the argument upon them consolidated with the main argument in the cause; and for the further reason that the testimony might be perpetuated, thereby permitting the court to adopt whichever theory it might be advised in reaching

what it conceived to be the proper rule to follow after giving the matter mature consideration.

Numerous cases have been cited by counsel to support their different contentions as to the rule governing the measure of damages in this case. I have examined all these cases and have come to the conclusion that the proper rule is practically governed by the individual circumstances in each case; that is to say, that peculiar circumstances proving damage, as in the case at bar, might bring that damage within the rule contended for by plaintiff, or might leave it within the rule contended for by defendant.

I shall therefore first briefly discuss the usable value rule of damages contended for by plaintiff, as supported by the courts, and then the facts of this case as being governed or not being governed by this rule. Following this, a brief analysis of the rule of damages contended for by defendant and the facts of the case as being governed or not being governed by that rule.

The so-called usable value rule or measure of damages is simply whatever damage the plaintiff may suffer from the loss of the use of the property by the acts of the defendant; and in applying this rule of the measure of damages itself, as it has generally been adopted by the courts and is contended for by the plaintiff in this case, it covers the loss of prospective profits by the plaintiff directly caused by the continuing trespass resulting from defendant's acts.

One case has been confidently relied upon by both plaintiff and defendant to support their various contentions; by the plaintiff to establish the proper measure of damages, and by defendant to establish the fact that, if the rule in this case laid down be the proper measure of damages, the proofs of plaintiff are not sufficient nor of the proper character to bring it within the rule.

This case is Central Coal & Coke Co. v. Hartman, 111 Fed. 96, 49 C. C. A. 244. It is a decision of the Circuit Court of Appeals of the Eighth Circuit, and in which the opinion of the court was voiced by Judge Sanborn, now the presiding judge of this circuit. This case has since frequently been cited by several of the federal courts, including the United States Supreme Court, with approval, and I think may safely be considered as the leading case upon the question at issue in the case at bar.

I believe it will be enlightening at this point to quote at length from this case for the purpose, in the first instance, of securing the proper basis which should govern the proof of damage in a case where the loss of prospective profits is claimed.

On page 98 of 111 Fed., on page 246 of 49 C. C. A., it is said:

"The only damages claimed in the petition, and the only losses which the plaintiff sought to prove at the trial, were the loss of some of the expected profits of his business of buying and selling coal between January 1, 1897, and January 25, 1899. Compensation for the legal injury is the measure of recoverable damages. Actual damages only may be secured. Those that are speculative, remote, uncertain, may not form the basis of a lawful judgment. The actual damages which will sustain a judgment must be established, not by conjectures or unwarranted estimates of witnesses, but by facts from which their existence is logically and legally inferable. The speculations, guesses, estimates of witnesses, form no better basis of recovery than the speculations

of the jury themselves. Facts must be proved, data must be given which form a rational basis for a reasonably correct estimate of the nature of the legal injury and of the amount of the damages which resulted from it, before a judgment of recovery can be lawfully rendered. These are fundamental principles of the law of damages. Now, the anticipated profits of a business are generally so dependent upon numerous and uncertain contingencies that their amount is not susceptible of proof with any reasonable degree of certainty; hence the general rule that the expected profits of a commercial business are too remote, speculative, and uncertain to warrant a judgment for their loss. [Cases cited.] There is a notable exception to this general rule. It is that the loss of profits from the destruction or interruption of an established business may be recovered where the plaintiff makes it reasonably certain by competent proof what the amount of his loss actually was. The reason for this exception is that the owner of a long-established business generally has it in his power to prove the amount of capital he has invested, the market rate of interest thereon, the amount of the monthly and yearly expenses of operating his business, and the monthly and yearly income he derives from it for a long time before, and for the time during the interruption of which he complains. The interest upon his capital and the expenses of his business deducted from its income for a few months or years prior to the interruption produce the customary monthly or yearly net profits of the business during that time, and form a rational basis from which the jury may lawfully infer what these profits would have been during the interruption if it had not been inflicted. The interest on the capital and the expenses deducted from the income during the interruption show what the income actually was during this time; and this actual net income, compared with that which the jury infers from the data to which reference has been made the net income would have been if there had been no interruption, forms a basis for a reasonably certain estimate of the amount of the profits which the plaintiff has lost. One, however, who would avail himself of this exception to the general rule, must bring his proof within the reason which warrants the exception. He who is prevented from embarking in a new business can recover no profits, because there are no provable data of past business from which the fact that anticipated profits would have been realized can be legally deduced. [Cases cited.] And one who seeks to recover for the loss of the anticipated profits of an established business without proof of the expenses and income of the business for a reasonable length of time before as well as during the interruption is in no better situation. In the absence of such proof, the profits he claims remain speculative, remote, uncertain, and incapable of recovery. In Goebel v. Hough, 26 Minn. 252, 258, 2 N. W. 847, 849, the Supreme Court of Minnesota said:

" 'When a regular and established business, the value of which may be ascertained, has been wrongfully interrupted, the true general rule for compensating the party injured is to ascertain how much less valuable the business was by reason of the interruption, and allow that as damages. This gives him only what the wrongful act deprived him of. The value of such a business depends mainly on the ordinary profits derived from it. Such value cannot be ascertained without showing what the usual profits are.'

"The truth is that proof of the expenses and of the income of the business for a reasonable time anterior to and during the interruption charged, or of facts of equivalent import, is indispensable to a lawful judgment for damages for the loss of the anticipated profits of an established business. * * *

"Expected profits are, in their nature, contingent upon many changing circumstances, uncertain and remote at best. They can be recovered only when they are made reasonably certain by the proof of actual facts which present data for a rational estimate of their amount. The speculations and conjectures of witnesses who know no facts from which a reasonably accurate estimate can be made form no better basis for a judgment than the conjectures of the jury without facts. The plaintiff in this case had his bank account at his command, which would certainly have given him some indication of the volume of his business before and after the interruption

of which he complained. He had his ledger, in which he testified that he had entered the charges of the coal which he had sold on credit. The bank account and the ledger account together, if properly kept, would have given at least an approximate statement of the value of the coal which he handled, because one would have shown his cash receipts, the other his charges for coal sold on credit, and the payments he received for that coal, and a careful comparison of the two would have enabled any intelligent bookkeeper to at least approximate the value of his business. These books were not produced. The indispensable facts to warrant a recovery of the expected profits of an established business were not established. There was no evidence of the amount of capital in the business, of its expenses or of its income, either before or after its interruption. There were no data for a rational estimate of the profits at any time during the continuance of the business; nothing from which the jury could reasonably infer that the business was profitable before, less profitable or profitless after, the plaintiff's withdrawal from the club. Much less were there any facts established which made the amount of the expected profits lost reasonably certain."

One other leading case in which the rule of damages based upon the loss of prospective profits was approved by the United States Supreme Court is that of Weinman v. De Palma, 232 U. S. 571, 34 Sup. Ct. 370, 58 L. Ed. 733, sustaining the ruling of the Supreme Court of New Mexico, found in 15 N. M. 68, 103 Pac. 782, 24 L. R. A. (N. S.) 423.

In the last-cited case the damage claimed for the plaintiff resulted from an excavation along the side of a building occupied by plaintiffs as a retail drug store. Owing to the excavation the abutting wall of the store gave way, causing the building to crumble and the contents to be destroyed. The plaintiffs were not the owners of the real estate or the building, but of the contents of the store which were used in conducting the business aforesaid. Plaintiffs claimed damages for a prospective loss of profits, inasmuch as it became necessary for them to move to another location, as well as the actual loss of the property so destroyed. Upon the first trial the judgment in favor of the plaintiffs was reversed as to the award for loss of prospective profits, upon the ground that the proofs were not sufficiently specific to take the damage outside the realm of speculation, as no books or specific figures showing what the profits were prior to the time that the damage occurred. Upon the retrial of the case specific testimony was offered covering this point and judgment was awarded for the loss of prospective profits, which judgment was sustained by the Supreme Court of New Mexico; the decision being later sustained by the Supreme Court of the United States in the case cited. Mr. Justice Pitney announces the rule in the following language, in 232 U. S. at page 575, 34 Sup. Ct. at page 371 (58 L. Ed. 733):

"In our opinion, the court correctly held that where a trespass results in the destruction of a building, with consequent interruption of a going business, the loss of future profits (these being reasonably certain and proved with reasonable exactitude) forms a proper element for consideration in awarding compensatory damages."

[2] The conclusion of this court is, therefore, that the damage to a going business by another, either on account of negligence or the commission of a continuing trespass, may be the loss of prospective profits providing they are proved with reasonable certainty so as to take them out of the realm of speculation, uncertainty, and remoteness.

An analysis of the testimony offered by the plaintiff to sustain its claim for damages in this case will now be necessary for the purpose of ascertaining whether or not the proofs bring the damage within the rule laid down.

The testimony of the plaintiff along this line is offered for the purpose of proving two specific elements of damage: First, the damage to the pasture land as making it unsuitable and unusable by plaintiff in its business as a lambing ground in the spring; and, second, the damage to the pasture land as making it unsuitable and unusable as a pasture for weak cattle in the fall.

Upon the first contention of plaintiff, evidence was offered tending to prove that before the floods carrying oil over the lands began, the pastures in controversy were used by the plaintiff as a lambing ground in the spring, and that after the oil came down with the floods in substantial quantities it was not available for such use. It might be said in passing that the proof in the light of defendant's testimony and the cross-examination of plaintiff's witnesses is far from satisfactory in its being conclusive that the plaintiff did use the Salt Creek pastures for a lambing ground consistently and continuously before the oil came down in substantial quantities. The witness H. W. Davis, on cross-examination, was unable to testify directly as to where the lambing of the plaintiff had been done during all the years prior to the year 1911 or 1912, when the first oil floods began. It was proven, however, that during some of the years prior the plaintiff had used creeks, rivers, and draws other than Salt creek, which leaves this element of the case in an uncertain condition of proof, such as should be necessary to sustain a damage claim for loss of prospective profits. But in addition to this element no testimony is offered by plaintiff in any way tending to prove the number of sheep which were lambed on Salt creek prior to the oil floods, compared with the number of sheep which plaintiff failed to lamb or was compelled under his contention to lamb elsewhere after the oil floods began and continued during the period for which plaintiff might be entitled to damage. No books of account, either as to what number of sheep run by plaintiff or the profits realized from the running of those sheep before or after the oil floods, were offered by plaintiff. The testimony was that these books, except loose memoranda kept by plaintiff, which were not produced in evidence, were kept by a firm in Denver, which received the moneys from the sale of sheep and disbursed moneys to plaintiff for the necessary expense of carrying on plaintiff's business, and even the books of this concern were not introduced in evidence by the plaintiff.

The same condition prevails, substantially, as to the damage alleged to have been sustained by plaintiff on account of loss of the use of pastures for weak cattle. There is no evidence as to the number of weak cattle that the plaintiff did pasture prior to the oil floods, as compared with the diminished number of cattle which plaintiff did run after the oil floods, as the testimony shows that plaintiff had a varying number of cattle in the different years before the oil floods as well as after them. Supporting this varying number, both of cattle and of sheep, were the assessment returns of the plaintiff during the years in con-

troversy which, in connection with the uncertain testimony of the witness Davis, president and chief owner of the capital stock of plaintiff, impresses the court to the conclusion that the number of sheep and cattle of the plaintiff must necessarily have been governed by other circumstances than the so-called oil floods.

The direct proof of monetary damages on account of the loss of the pastures as a lambing ground was offered upon the basis that the wool clip from the sheep paid the running expenses of the business, and that the profits accruing from the business resulted from the sale of wether lambs and old ewes. Figuring from this basis the additional herd it might be possible for the plaintiff to run with the use of the Salt Creek pastures and the average price generally received for the sale of sheep by those who have been engaged in the sheep business, the plaintiff arrives at a figure of loss each year aggregating $10,687.50.

Likewise, plaintiff's proof of loss for use of pasture for weak cattle is arrived at by testimony which first assumes the capacity of the pasture in the fall and winter for weak cattle, then the average number of weak cattle in an average herd, and then the number of the additional herd of cattle which plaintiff would be able to run, based upon this number of weak cattle. The ultimate conclusion of the plaintiff is that the profits from this supposed herd of cattle would be a certain amount per head, considering the average profits in the cattle business. It must be borne in mind that the testimony of the plaintiff was not that its profits were actually these, either in sheep or cattle. What the testimony tended to show were the average profits in these two classes of business.

In addition to the testimony of the witness Davis, president of the plaintiff company, other witnesses were introduced by the plaintiff as experts to testify to what was considered a fair and average profit per head in the sheep and cattle business in the community in which the business of the plaintiff was located.

[3] I cannot conceive of any class of testimony which would bring the proof of damage more within the realm of speculation than does this class. It is a matter of common knowledge that success in business, and thereby the derivation of profits therefrom, depends upon many varying circumstances. Some of the constituent elements of this success in the class of business being considered in this case must be the business acumen of the principal; the market prices of stock to be sold; the quantity and quality of pasture available to the business, both as to owned lands and outside lands used for grazing purposes; the quality of the stock raised; loss through the elements or other unfortunate circumstances; loss through disease; the condition of the labor market; the efficiency of labor; and the attention or lack of attention of the owner to his business. All these elements make for success in any business.

It may be that the conclusion of the witnesses for the plaintiff, covering the average profits in the sheep or cattle business in a certain community, under similar conditions, which include all or the greater portion of all the business ventures in that community, would bring to the people so engaged a net profit such as has been testified to; but certainly

no witness would attempt to testify that all the men so engaged in that community had made just this profit and not more, or that some so engaged had not made much less or had not failed in business utterly. The adoption therefore of such a rule in this case would be to give the plaintiff, without proof as to his own profits either before or after the oil floods, the advantage and benefit of a profit such as is the average profit in this class of business, when it is as fair to assume that the plaintiff is one who has failed to make a success in his particular line of business. There is no proof in the case whatever that the profits of plaintiff prior to the oil floods, considering the amount of stock run, netted the plaintiff the amount contended for as profits in either the sheep or cattle business, or that his profits since the oil floods and within the time for which damage is claimed were diminished pro rata. There is likewise no proof as to the accumulation of wealth to the plaintiff in the two classes of business in which it has been engaged during the periods before and after the oil floods, and yet damages are asked in this case in the aggregate covering the period of four brief years which, considering the size of plaintiff's business, would be fairly commensurate, in the opinion of the court, with the savings of a lifetime or generation. As was aptly said by Judge Sanborn in Central Coal & Coke Co. v. Hartman, supra:

"Litigants cannot be permitted to estimate the money out of the coffers of their opponents in this reckless way."

Another element which may be mentioned briefly in passing, which would seem to have a bearing upon the issues in this case, is the extent of the so-called outside range upon which the plaintiff must depend, according to its own testimony, in maintaining large herds of cattle and sheep. It is undisputed in the testimony that this so-called outside range is continually being taken up by homesteaders, and particularly has this been true during the last five or six years. The testimony shows that a considerable number of homesteads outside the pastures of the plaintiff on Salt creek and on either side have been so taken up by homesteaders, thereby diminishing the grazing land of the plaintiff. It cannot be assumed in the face of this testimony that it would be possible for the plaintiff during the last four years to have maintained as large herds of cattle and sheep as under conditions in which the entire outside range was open to these herds for grazing purposes. This must also be taken as an element which would have a direct bearing upon the element of damage to plaintiff in maintaining his contention that as large herds could be maintained by him during the last four years as could have been maintained previous to the oil floods.

The only conclusion to which this court can come by this analysis of the testimony is that the plaintiff by its proof has not brought itself within the rule laid down by the courts in governing damage claimed by reason of the loss of prospective profits.

[4] This leads us to a consideration as to the measure of damages suggested by the defendant, to wit, the rental value of the lands in controversy. As has been suggested, it is the opinion of the court that the proper rule must be determined by the circumstances of the individual case. In this case, by the above conclusion of the court, the

proof of plaintiff having failed to bring the case within the rule of loss on account of the usable value of the land, it seems that a court of equity should consider any proof in the case which would tend to be sufficient to sustain a decree awarding damages to the plaintiff. Several cases have been cited which would tend to be sufficient to sustain a decree awarding damages to the plaintiff. Several cases have been cited by the defendant in which the rental value of the lands have been adopted as the proper rule of damage in cases of this or of a similar character.

In the case of City of Chicago v. Huenerbein, 85 Ill. 594, 28 Am. Rep. 626, the rule is succinctly stated in the syllabus as follows:

"Where land is wrongfully overflowed so as to deprive the owner of its use, the true measure of damages is its fair rental value. The supposed value of what might have been raised on the same had it been cultivated, less the cost of cultivation and marketing, is too remote and speculative."

To the same effect, although in a different class of cases, is Jackson v. Chicago, S. F. & C. Ry. Co. (C. C.) 41 Fed. 656.

Without citing other cases, it may be said generally that this measure has frequently been adopted by the courts as the rule of damages in cases of this class or of a similar character, and in this case is urged by the defendant as the proper measure of damages. Considering therefore that proof is before the court as to the damage sustained by the plaintiff under this rule, it will be adopted by the court as the rule in this particular case, if the evidence is sufficient to justify the court in assessing damages upon this basis.

[5] The only evidence offered was by the defendant through the witness Wheeler, who qualified as an expert witness in proving the rental value of pasture lands, such as the Salt Creek pastures in that community, for grazing purposes. The witness testified that the fair rental value of the pasture would be from 5 to 40 cents per acre per annum. The comparatively large fluctuation in the maximum and minimum price, according to the subsequent explanation of the witness, was on account of taking into consideration the connection of the pastures with the remaining ranch property of the plaintiff. As the testimony showed that these pastures were adjacent to and used in connection with the remaining ranch lands and property of the plaintiff, it would be fair to assume that their rental value under these circumstances would reach the maximum figure suggested by the witness, or 40 cents per acre per annum. Using this therefore as the basis for computing the damage in dollars and cents, on the basis of the acreage in the pastures testified to by plaintiff's witnesses of 1,800 acres, it would lead to a conclusion of the fair rental value of the pastures at $720 per annum. This therefore will be adopted by the court as the proof of damage in this case, and it will be allowed upon this basis for the four years prior to the 4th day of August, 1920, upon which date the complaint in this case was filed, and amounting to $2,880, for which the plaintiff may have a decree.

[6] The view of the case on the question of damages as adopted in this memorandum leads to the disposition of the objections to the testimony covering the basis of damage in the following manner: As

the rule, as heretofore stated, may be governed by the individual circumstances in each case, it was impossible for the court to determine the proper rule until all the evidence upon the question was presented. As the evidence under plaintiff's theory failed, although it might have been accepted if sufficient and of a proper character to sustain the contention, the evidence was properly admitted, and as the other rule which has been adopted by the court is the only rule left under which damage might be assessed, and has been used by the courts in cases of similar character, the evidence under this rule was also properly admitted, and the objections of both plaintiff and defendant will be overruled.

The remaining question in the case is that of the injunction prayed for, and in view of the conclusion reached by the court as to the damage proved by plaintiff, it cannot be said to appeal to the good conscience of the court in exercising the extraordinary arm of the law in the nature of an injunction to restrain the operations of the defendant, which are of such a far-reaching character. One of the main issues in the case earnestly presented by counsel, on both sides, was the question of so-called "comparative injury," as an element entering into the right of plaintiff for injunctional relief. Certainly, in view of the conclusion which the court has reached upon the question of damage, a permanent injunction, under all the circumstances, could not reasonably be expected to follow. As to whether or not there is such a doctrine as "comparative injury" in cases of injunction seems to be a matter much in dispute between opposing counsel in this case, and only for the purpose of disposing of some of the reserved rulings on the admission of testimony, and applying a rule of equity which the court feels permissible in preventing continued litigation between the parties, will it be discussed.

If I am able to analyze the opinion properly in the case of Arizona Copper Co. v. Gillespie, 230 U. S. 46, 33 Sup. Ct. 1004, 57 L. Ed. 1384, the court here leaves the question open for a determination upon the individual circumstances in each case as to whether or not this rule in any case should be applied. The court in its opinion say:

"Whether upon a bill such as this a court of equity will restrain the acts of the party complained of, or leave the plaintiff to his action at law for damages, must depend upon the nature of the injury alleged, whether it be irremediable in its nature, or whether an action at law will afford an adequate remedy, and upon a variety of circumstances, including the comparative injury by granting or refusing the injunction."

To substantially the same effect is the decision in Atchison v. Peterson, 20 Wall. 507, 22 L. Ed. 414, and Kansas v. Colorado, 206 U. S. 46, 27 Sup. Ct. 655, 51 L. Ed. 956.

[7] Therefore the evidence offered by the defendant touching the injury which would ensue to the defendant in the event an injunction should issue restraining the operations of the defendant in the oil field was properly admitted, in order to allow the court to ascertain, in view of all the circumstances surrounding the element of damage, whether or not the injunction should issue. The several objections to this class of testimony will therefore be overruled.

This theory of the rule as adopted in this case should not be under-

stood as going so far as to mean that the court might establish itself as a tribunal to exercise without authority of statute the right of eminent domain against any person, as under no circumstances could it be assumed that without such a right established by statute could a court presume to take from a man of lesser financial worth his property and assign it for the use and benefit of one of greater financial worth. Any such construction would be subversive of the rights guaranteed by our Constitution. It does mean, however, that in each case, in the opinion of the court, all circumstances may be taken into consideration which appeal to the court in its broad sense of discretion in the administration of justice and equity as to what should be the rule to govern each particular case. So far as "comparative injury" is concerned, it is directly implied by the well-established rule to govern courts in awarding injunctions. It is an extraordinary remedy and can only be invoked when the party petitioning has no adequate remedy at law and when a great and irreparable injury has been or will be committed.

[8] There is a rule recognized by some of the courts which has been applied in the alternative sense; that is, if the party against whom the damage is found to have been committed shall pay that damage that an injunction will not issue. On the contrary, if the party against whom the damage is found neglect or fail to pay the damage assessed, that the injunction shall issue. It seems to this court that under the circumstances of the case and the damage proven, this damage is sufficient to invoke this rule as against the defendant, and also to provide a way in the future by which the plaintiff may be relieved from being compelled each year to seek damages in a court so long as the trespass of the defendant may continue. This rule was placed in operation in the case of McCleery v. Highland Boy Gold Min. Co. (C. C.) 140 Fed. 951, and also in New York City v. Pine, 185 U. S. 93, 22 Sup. Ct. 592, 46 L. Ed. 820.

The decree in this case may therefore provide that if within 60 days the defendant pay or tender to plaintiff the damages assessed in the sum of $2,880, and pay the costs of this suit, and further pay or tender to plaintiff the sum of $720, the annual rental of said land for the year ending August 4, 1921, said injunction will not issue, but otherwise said injunction may issue restraining the defendant from the commission of the trespass upon plaintiff's lands. And the decree may further provide that unless the defendant shall pay or tender to plaintiff the sum of $720 each year, on or before the 4th day of August following, so long as the trespass shall continue in manner and in form as shown by the evidence in this case, this court will entertain a petition of the plaintiff for an injunction as prayed for in the complaint before the court.

[9] The other objections to the introduction of testimony upon which the court reserved its ruling, so far as they are remembered at this time, are the offer of pictures taken of the Muddy Oil field, in which the objection of the defendant will be sustained, for the reason that it nowhere appears in the evidence that the conditions surrounding operations in this field are the same or similar to the conditions surrounding the operations in the Salt Creek field.

The ruling of the court reserved as to the question of laches will be to overrule the objection of plaintiff and allow the testimony to stand, as it appears from the view which the court has taken that its consideration was not necessary to the proper disposition of the case, and, in addition, the evidence showed a series of conferences between the parties looking to a settlement which did not materialize.

Other reserved rulings, if there are any such, should follow the general opinion of the court as set forth in this memorandum.

A decree may be prepared consistent with this memorandum, containing proper findings of fact and conclusions of law, and reserving to both parties proper exceptions to protect their rights upon appeal.