**Thomas WIRTZ, Plaintiff,**

v.

**KANSAS FARM BUREAU SERVICES, INC., Defendant.**

**No. 01–2436–KGS.**

United States District Court,
D. Kansas.

March 31, 2004.

David O. Alegria, McCullough, Wareheim & LaBunker, P.A., Topeka, KS, for Plaintiff.

Deena Hyson Bailey, Teresa L. Mah, Terry L. Mann, Martin, Pringle, Oliver, Wallace & Bauer, LLP, Wichita, KS, for Defendant.

### MEMORANDUM AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW AND DENYING DEFENDANT'S MOTION FOR NEW TRIAL

SEBELIUS, United States Magistrate Judge.

This matter comes before the court upon the motion of defendant Kansas Farm Bureau Services, Inc. ("KFBS") for judgment as a matter of law and for a new trial pursuant to Fed.R.Civ.P. 50 and 59 against the plaintiff, Thomas Wirtz (Wirtz). (Doc. 127). Plaintiff filed his response on October 2, 2003. (Doc. 137). Defendant filed a reply on October 30, 2003. (Doc. 142). For the foregoing reasons, defendant's motion for judgment as a matter of law pursuant to Fed.R.Civ.P. 50 is granted in part and denied in part, and defendant's motion for new trial pursuant to Fed.R.Civ.P. 59 is denied.

### INTRODUCTION

On August 29, 2001, the plaintiff filed his complaint under Title VII of the Civil Rights Act of 1964 ("Title VII")[1] against the defendant, alleging gender employment discrimination, sexual harassment/hostile work environment, and retaliation. The case was tried before a jury commencing on June 16, 2003. On June 23, 2003, the jury returned a verdict in favor of plaintiff on the claim of gender

---

1. 42 U.S.C. § 2000e et seq.

discrimination and in favor of defendant on the claims of sexual harassment and retaliation. The jury awarded the plaintiff $1,000 for emotional pain and suffering, $12,000 in pecuniary damages, and $20,000 in punitive damages. The jury, sitting in an advisory capacity only, declined to award plaintiff any damages for lost wages or lost benefits. On July 23, 2003, the court awarded the plaintiff back pay in the amount of $8,063, with prejudgment interest thereon in the amount of $1,363. (Doc. 125).

Defendant now seeks to reverse the jury verdict with respect to the finding of gender discrimination and the award of pecuniary and punitive damages, and to reverse or modify the court's award of back pay. In the alternative, defendant seeks a new trial on the issues of reverse gender discrimination and damages.

## DISCUSSION

### A. Post–Verdict Motion for Judgment as a Matter of Law

#### 1. Legal Standards

 A motion for judgment as a matter of law under Fed.R.Civ.P. 50 [2] "may be granted only when, without weighing the credibility of the evidence, there can be but one reasonable conclusion as to the proper judgment." [3] Judgment as a matter of law is appropriate "only if the proof is all one way or so overwhelmingly preponderant in favor of the movant as to permit no other rational conclusion." [4] "Judgment n.o.v. should be cautiously and sparingly granted." [5] "In determining whether the grant of a motion for judgment n.o.v. is appropriate, the court must view the evidence and indulge all inferences in favor of the party opposing the motion and cannot weigh the evidence, consider the credibility of witnesses or substitute its judgment for that of the jury." [6]

At the close of the plaintiff's case and at the close of all the evidence in the trial, defendant moved the court for judgment as a matter of law in its favor. Following the presentation of the parties' arguments, the court denied defendant's motion. Defendant now renews its motion, seeking judgment as a matter of law that (1) the plaintiff failed to present sufficient basis for judgment on the reverse gender discrimination claim, (2) the plaintiff failed to

**2.** With the 1991 amendments, Fed.R.Civ.P. 50(a) now permits parties to move "for judgment as a matter of law" before the case is submitted to the jury, Fed.R.Civ.P. 50(b) permits parties to move for a "renewed judgment as a matter of law" within 10 days of the entry of judgment. Although the "judgment as a matter of law" or "JMOL" terminology replaces the earlier designations of "directed verdict" and "judgment notwithstanding the verdict" ("j.n.o.v."), the legal standards governing the analysis of such motions remain unchanged. *See Weese v. Schukman,* 98 F.3d 542, 547 (10th Cir.1996); *see also* 1991 Advisory Committee notes to Fed.R.Civ.P. 50. Defendant KFBS moved for judgment as a matter of law at the close of the plaintiff's case, renewed its motion at the close of all the evidence before the case was submitted to the jury, and renews such motion in the instant pleading.

**3.** *Jackson v. City of Albuquerque,* 890 F.2d 225, 230 (10th Cir.1989), citing *5A Moore's Federal Practice,* Section 50.07(2) (1986).

**4.** *J.I. Case Credit Corp. v. Crites,* 851 F.2d 309, 311 (10th Cir.1988); *see also EEOC v. Prudential Federal Sav. & Loan Ass'n,* 763 F.2d 1166, 1171 (10th Cir.1985) (Judgment n.o.v. is "appropriate only when 'the evidence points but one way and is susceptible to no reasonable inferences which may sustain the position of the party against whom the motion is made.' ").

**5.** *Lucas v. Dover Corp.,* 857 F.2d 1397, 1400 (10th Cir.1988) (citations omitted).

**6.** *Id.* (citations omitted).

present sufficient basis for judgment on damages as to back pay, pecuniary damages, and costs, and (3) the plaintiff failed to present sufficient basis for judgment on punitive damages.

█ In assessing defendant's arguments regarding this motion, the court must view all the evidence in the light most favorable to the plaintiff, and must deny the motion unless all the evidence presented at trial so overwhelmingly supports the defendant as to permit no other rational conclusion.

### 2. Plaintiff's Claim of Reverse Gender Discrimination.

Following the presentation of all the evidence, the jury found that defendant discriminated against the plaintiff on the basis of his gender, that being male. Defendant argues that the evidence presented at trial does not support this verdict. In support of this argument, defendant claims that the court gave erroneous jury instructions by incorrectly outlining the elements of a reverse gender discrimination claim. Plaintiff cannot, defendant argues, satisfy the *correct* elements of the reverse gender discrimination. Furthermore, defendant claims that even if the jury instructions used by the court were correct, plaintiff failed to present sufficient evidence at trial to support his claim of reverse gender discrimination.

### a) Reverse Gender Discrimination Jury Instructions

The court gave the jury the following instructions related to plaintiff's gender discrimination claim:

**Jury Instruction No. 21:**

Your verdict must be for the plaintiff and against defendant on plaintiff's sex discrimination claim if all the following elements have been proved by the preponderance of the evidence:

First, defendant discharged plaintiff; and

Second, plaintiff's gender was a motivating factor in defendant's decision.

If either of the above elements has not been proved by the preponderance of the evidence, your verdict must be for the defendant and you need not proceed further in considering this claim.[7]

**Jury Instruction No. 22:**

In order for plaintiff to establish a gender discrimination claim against defendant, plaintiff has the burden of proving, by a preponderance of the evidence, that defendant's actions were motivated by the plaintiff's gender.

Plaintiff must prove that defendant intentionally discriminated against plaintiff, that is, plaintiff's gender must be proven to have been a motivating factor in defendant's decision to terminate plaintiff.

The mere fact that plaintiff is a male and was terminated is not sufficient, in and of itself, to establish plaintiff's claim under the law.

In showing that plaintiff's gender was a motivating factor, plaintiff is not required to prove that plaintiff's gender was the sole motivation or even the primary motivation for defendant's decision. Plaintiff need only prove that gender played a motivating part in defendant's decision, even though other factors may also have motivated defendant.

The term "motivating factor" means a consideration that moved defendant toward defendant's decision.[8]

**Jury Instruction No. 22A:**

If you find that the plaintiff has proven by a preponderance of the evidence that defendant engaged in impermissible gender discrimination, you must find in

---

7. Doc. 117.

8. *Id.*

favor of the plaintiff unless the defendant has articulated a legitimate, nondiscriminatory explanation for the adverse employment action taken against plaintiff. If defendant has articulated a non-discriminatory explanation for the unfavorable action taken against the plaintiff, then you must find in favor of the defendant unless the plaintiff proves by a preponderance of the evidence that the defendant's alleged explanation is merely a pretext for impermissible gender discrimination.

In order to prove that defendant's alleged explanation is a pretext for impermissible gender discrimination, the plaintiff may attempt to prove, by preponderance of the evidence, that his gender more likely motivated defendant's decisions than the reason stated by defendant or the plaintiff may show that the explanation is unworthy of belief.

If you do not believe defendant's explanations, you may, but are not required to, infer that plaintiff has satisfied plaintiff's burden of proof that the defendant's legitimate non-discriminatory reason was merely a pretext for impermissible gender discrimination and you must find in favor of the plaintiff. If plaintiff failed to prove that the explanation is a pretext, you must find in favor of defendant on the gender discrimination claim.[9]

Defendant argues that the instructions given by the court are appropriate in the case of a *common* gender discrimination claim. They must, however, be modified to reflect the different standard of proof required of *reverse* gender discrimination plaintiffs. Defendant claims that the Tenth Circuit Court of Appeals adopted a higher burden of proof for reverse discrimination plaintiffs that requires modification of the common gender discrimination instructions.[10]

■ The court will analyze plaintiff's gender discrimination claim under the burden-shifting framework articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green.*[11] Pursuant to the *McDonnell Douglas* decision, the following three steps are required for evaluating Title VII disparate treatment claims:

First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.[12]

---

**9.** *Id.*

**10.** *Notari v. Denver Water Dept.,* 971 F.2d 585, 589 (10th Cir.1992).

**11.** 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Plaintiff claims that the burden shifting paradigm under *McDonnell Douglas* is only appropriate where there is no direct evidence of discrimination. The court concludes that such interpretation of the caselaw is erroneous. Evidence of direct discrimination or indirect evidence sufficient to support, as a reasonable probability, the inference

that, but for plaintiff's race, the employment decision would have been different are merely two alternative means of establishing a prima facie case of discrimination. If sufficient evidence exists, the employer should be permitted to articulate a nondiscriminatory reason for its decision, and the plaintiff should "have a chance to show the articulated [reason] is pretextual". *See Notari,* 971 F.2d at 590–91 (adopting the *alternative* method of establishing a prima facie case.).

**12.** *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089,

■ When the plaintiff belongs to a minority group, he may establish the prima facie case by showing that "(1) he belongs to a protected class of minority; (2) he was qualified for the job from which he was discharged; (3) he was discharged despite his qualifications; and (4) after the discharge, the position remained open and the employer sought applicants whose qualifications were no better than plaintiff's."[13]

■ In a reverse discrimination case, such as this one, where the plaintiff belongs to a majority group—white males—the Tenth Circuit has modified the first prong of the prima facie case: "In lieu of showing that he belongs to a protected group, [a plaintiff may] establish background circumstances that support an inference that the defendant is one of those unusual employers who discriminates against the majority."[14] In the alternative, a majority plaintiff may establish a prima facie case by showing "direct evidence of discrimination, or indirect evidence sufficient to support a reasonable probability that, but for the plaintiff's status, the challenged employment decision would have favored the plaintiff."[15] When the plaintiff uses this alternative method, the plaintiff does not benefit from the presumption of intentional discrimination, which arises only when plaintiff's evidence meets the modified four-step prima facie case.[16] In other words, it is not enough,

under this alternative formulation, for a plaintiff merely to allege that he was qualified and that someone with different characteristics was the beneficiary of the challenged employment decision. Instead, the plaintiff must "allege and produce evidence to support specific facts that are sufficient to support a reasonable inference that but for plaintiff's status, the challenged decision would not have occurred."[17]

As the defendant summarizes in the instant motion, "there are three ways plaintiff could meet his burden of proof for a reverse discrimination claim: 1) Direct evidence of intentional discrimination; 2) Indirect evidence under *McDonnell Douglas* framework by first proving sufficient background facts that defendant discriminates against the majority; or 3) Indirect evidence sufficient to support a reasonable probability that 'but for' plaintiff being male, the challenged employment decision would have favored him."[18]

■ Defendant claims that because the court instructed the jury that plaintiff's prima facie case showing was made where he demonstrated that his gender was *a motivating factor*, rather than a *"but for"* factor, the verdict cannot stand. The plaintiff disagrees. Plaintiff's counsel argues that so long as the "jury understood the issues to be resolved and its duty to

---

67 L.Ed.2d 207 (1981), quoting *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817.

13. *Wolfenbarger v. The Boeing Co.*, 1994 WL 149187, *4, 1994 U.S. Dist. LEXIS 4800, *13–14 (D. Kan. April 1, 1994), citing *Trujillo v. Grand Junction Regional Ctr.*, 928 F.2d 973, 977 (10th Cir.1991).

14. *Notari*, 971 F.2d at 589.

15. *Id.* at 590.

16. *Id.*

17. *Id.*

18. Defendant's Memorandum in Support of Defendant Kansas Farm Bureau Services' Motion Pursuant To Rules 50 and 59 of the Federal Rules of Civil Procedure, p. 7. (Doc. 127). Citing *Gallo–Loeks v. U.S. West Comm., Inc.*, 57 Fed. Appx. 846 (10th Cir.2003) (discussing the three ways to meet a prima facie case in a reverse discrimination case); *Rhoads v. Wal–Mart*, 83 F.3d 433 (10th Cir. 1996) (same); *Reynolds v. Tele–Comm., Inc.*, 77 F.3d 493 (10th Cir.1996) (same); *Silva v. Goodwill Ind.*, 210 F.3d 390 (10th Cir.2000) (same).

resolve them," the wording of the instructions is not flawed.

The court agrees with the defendant that the Tenth Circuit in *Notari* allowed three alternatives for a reverse discrimination plaintiff to prove a prima facie case of discrimination. However, the court does not believe that by its decision in that case the Tenth Circuit mandated any specific or particular wording to be used in the reverse gender discrimination jury instructions. The court finds that the plaintiff did not "miss" the point when he argued that the ultimate inquiry is whether the jury understood its duty in the case. By contrast, the court is afraid that the defendant has lost sight of the fact that the jury in a reverse gender discrimination case, just like a jury in a common gender discrimination case, must ultimately decide whether a violation of Title VII has occurred. In other words, in both cases the jury must determine whether an impermissible factor has led to the challenged decision. So long as that charge is made clear, the losing party should not be allowed to challenge the verdict simply because one instruction was phrased contrary to its wishes.

Title VII prohibits discrimination on the basis of gender. Therefore, the ultimate question for the jury deciding a gender discrimination case is whether the defendant discriminated against the plaintiff on the basis of his gender. In a reverse gender discrimination case, the jury must decide whether the defendant treated the male plaintiff less favorably than his female counterpart and whether the plaintiff's gender—male—was the reason for the adverse employment action. "No particular form of words is essential if the instruction as a whole conveys the correct statement of the applicable law." [19]

The court instructed the jurors that they must find for the plaintiff if the plaintiff proved that he was discharged and that his gender "was a motivating factor in defendant's decision" to discharge him. In other words, if defendant's actions were motivated by the plaintiff's gender, the court instructed the jury to find for the plaintiff. Furthermore, in the verdict form the jury was asked whether they believed that the "plaintiff has proven, by a preponderance of the evidence, that defendant intentionally discriminated against him on the basis of his gender?" [20] The jury instructions, together with the verdict form, clearly indicate to the jury that unless defendant's actions were motivated by plaintiff's gender, they had an obligation to find for the defendant. By their response to the first question on the verdict form, the jurors indicated that the plaintiff had proven, by a preponderance of the evidence, that defendant intentionally acted in a manner prohibited by Title VII.

Despite the jury's conclusion that defendant discriminated against the plaintiff "on the basis of his gender," defendant argues that the court erred in instructing the jury on the elements of reverse gender discrimination. Defendant states that the second prong of Jury Instruction No. 21 should have been replaced with the alternative *Notari* formulation—that "but for" the plaintiff's gender, he would not have been terminated. The court finds that in the instant case the difference proposed by the defendant is immaterial to the ultimate question presented to the jury.

At trial, defendant argued that it terminated plaintiff's employment for disci-

---

**19.** *Considine v. Newspaper Agency Corp.*, 43 F.3d 1349, 1365 (10th Cir.1994), citing *Faulkner v. Super Valu Stores, Inc.*, 3 F.3d 1419, 1424 (10th Cir.1993).

**20.** Verdict Form, Question 1, (Doc. 119).

plinary reasons, mainly his violation of a directive not to contact Ms. Farley on company time or on company property.[21] By contrast, the plaintiff claimed that the defendant terminated him because he is male. The jury, therefore, was faced with two alternative explanations for the defendant's behavior—legitimate disciplinary action or unlawful gender discrimination. Under the jury instruction formulation proposed by the defendant, the jury would have had to find that but for defendant's unlawful consideration of the plaintiff's gender, plaintiff's employment would not have been terminated.

The only other explanation for defendant's behavior presented at trial was legitimate discipline of a misbehaving employee. Therefore, in order for the jury to conclude that the plaintiff was fired because of his gender and not because of his misbehavior, the jury had to find that no such misbehavior occurred and, therefore, disregard defendant's proffered explanation of the termination. Once the jury determined that the alternative offered by defendant was not viable, it was instructed it *could* infer unlawful gender discrimination by the defendant. Because it was faced with only two alternative explanations for defendant's behavior, the jury logically could conclude that, without the improper motivation, defendant would not have terminated the plaintiff.

The reasoning and the outcome are the same under the jury instructions used in this case. The jury was instructed to find for the plaintiff if it determined that the "plaintiff's gender was a motivating factor in defendant's decision." Although other factors could have motivated the defendant, the jury was further instructed that it should find for the defendant if the

defendant offered a legitimate, nondiscriminatory reason for its conduct unless the jury concluded that such reason was a pretext for unlawful discrimination.[22] The court must look at all the jury instructions together to determine whether the jurors were misled in their decision.

Jury Instruction No. 22A informs the jury that it must find for the defendant if it has articulated a legitimate, non-discriminatory explanation for its behavior. In this case, plaintiff's alleged violation of the No Contact Memorandum was the *only* other reason or alternative offered by the defendant. That same instruction directs the jury to find for the plaintiff if it disbelieves the proffered non-discriminatory alternative and concludes that defendant's explanation was merely a pretext for discrimination. Armed with this instruction, the jurors found for the plaintiff and determined, as evidenced by their answer to Question 1 on the Verdict Form, that defendant intentionally discriminated against the plaintiff. Because, as noted above, the jury was faced with only two alternative explanations for plaintiff's termination— the plaintiff's violation of a corporate directive or gender—it is clear that the jury did not believe the defendant. Thus, under the instructions utilized by the court, the jurors properly concluded that unlawful gender discrimination was the only reason for plaintiff's termination.

It appears to the court that because the same conclusion is reached under the instructions used by the court and the instructions proposed by the defendant, the formulation of the instructions was immaterial to the eventual outcome of this case.

---

21. This directive was memorialized in a January 25, 2000 memorandum signed by the plaintiff (the "No Contact Memorandum"). Defendant's Exhibit No. 410.

22. *Id.*

### b) Evidence Demonstrating Reverse Gender Discrimination

The court must now turn to the argument that, regardless of the instructions, the plaintiff failed to prove sufficient elements to substantiate the claim of reverse gender discrimination. Defendant argues that, the plaintiff did not present sufficient evidence to establish his prima facie case of reverse gender discrimination. In essence, defendant invites the court to revisit the trial and reexamine the evidence. The court must review defendant's motion in the light most favorable to the plaintiff.[23]

 As noted earlier, the Tenth Circuit decision in *Notari* governs the burden of proof issues in reverse gender discrimination cases in this district.[24] Defendant claims, and the plaintiff does not appear to dispute, that the plaintiff did not present either direct evidence of intentional discrimination or evidence of sufficient background circumstances to prove that defendant was the unusual employer who discriminated against the majority. The court agrees with this assessment of the evidence presented at trial. Therefore, the court must determine whether the plaintiff demonstrated by indirect evidence sufficient to support a reasonable probability that, but for being male, he would not have been discharged from employment.[25] The plaintiff should prevail if he showed that without improper motivation defendant would not have terminated his employment. In the instant motion, the parties disagree over whether the plaintiff ultimately met his burden.

 This court cannot grant defendant's motion unless the "proof is all one way or so overwhelmingly preponderant in favor of the movant as to permit no other rational conclusion." [26] This court does not have the power to reweigh the evidence and must rest its decision on the credibility determinations made by the jury.[27]

At trial defendant attempted to show that it acted fairly and without gender animus when faced with complaints regarding the plaintiff and complaints made by the plaintiff regarding other employees, Ms. Farley among them. In the instant motion, defendant relies upon its actions on five different occasions. The jury, by returning the verdict in favor of the plaintiff, found that in at least one of these cases defendant's actions could not be explained without resorting to the explanation advanced by the plaintiff—that gender played an impermissible part in defendant's decision. The court has re-examined the incidents outlined by the defendant and finds that it cannot substitute its own judgment for that of the jury.

### i. June 1999 Memorandum

 It is undisputed that defendant first learned about any potential issues regarding the plaintiff's complaints and complaints regarding the plaintiff when Ms. Julie Farley, an employee in the defendant's Records Department, complained

---

23. *Lucas*, 857 F.2d at 1400.

24. The court finds defendant's suggestion that the court did not consider *Notari* when ruling on defendant's prior motions for judgment as a matter of law without merit. Absent *en banc* reconsideration or an intervening Supreme Court decision, this court is bound by the precedent set forth by the Tenth Circuit Court of Appeals, and has considered such precedent in all of its prior rulings.

25. Furthermore, the plaintiff could rebut an explanation of defendant's actions with evidence that such explanation was merely a pretext for unlawful gender discrimination.

26. *J.I. Case Credit Corp.*, 851 F.2d at 311.

27. *Lucas*, 857 F.2d at 1400.

about a bouquet of flowers she received from the plaintiff. In response to this complaint, plaintiff stated that he and Ms. Farley were having a consensual relationship that she initiated. Furthermore, plaintiff stated that Ms. Farley stalked him and pressured him to become involved, and that her complaint was nothing more than an attempt to mask their relationship from the eyes of her co-workers. Defendant argues that, based on the information provided, "it could not determine what exactly had happened between these two co-workers, and issued both employees the same memorandum [28] instructing them to refrain from contact at work unless it was work related." [29] The plaintiff claims that defendant "made no serious effort to investigate the facts of Mr. Wirtz's claims," [30] and instead issued a memorandum "in which it looks like [Ms. Farley's] name was added as an afterthought, and about which [Ms. Farley] testified was not a reprimand towards her but exactly what she requested that defendant do to Mr. Wirtz." [31] During her testimony, Ms. Farley further indicated that she believed the memorandum was given to her for information only.

While the court agrees that the defendant was not required to engage in an overly invasive investigation into the existence of an alleged relationship between the plaintiff and Ms. Farley, a reasonable jury could conclude that defendant's June 1999 reprimand was directed primarily, if not solely, at the plaintiff and that Ms. Farley's complaint was afforded more weight than the complaints leveled by the plaintiff. Because this court cannot overturn the jury's credibility determination, it must find that defendant did not demonstrate that the evidence presented on this point was so overwhelmingly in its favor as to permit another conclusion.

### ii. Plaintiff's Complaints Between June 1999 and January 2000.

 Plaintiff testified at trial that he reported to his supervisor, Paul Pullen, that Ms. Farley was spreading lies and rumors about him, and that she started the alleged relationship prior to June 1999. Plaintiff admitted at trial that he could not identify exactly what lies or rumors were being spread about him, except that Ms. Farley called him a "psycho" to Shelley Forrest, which last allegation plaintiff did not report to Mr. Pullen. Plaintiff also testified that Mr. Pullen refused to pass his complaints on to the Human Resources Department. Plaintiff believed that he could not himself report his complaints to Human Resources because Mr. Pullen was his immediate supervisor.

Defendant argues that there simply was no basis in fact for plaintiff's 'facts and rumors' allegation, and, therefore, plaintiff's complaints did not warrant an investigation. Furthermore, defendant showed during trial that plaintiff was aware of the directive contained in KSFB's Associate Handbook that any employee who feels they are being harassed should report the harassment to the supervisor *or the Human Resources director.* [32] In his Response, plaintiff counters that defendant's claim that it did not have sufficient information to investigate is "preposterous" because an "investigation, by definition, seeks to uncover that which is not readily

---

28. Defendant's Exhibit No. 405.

29. Defendant's Memorandum in Support of Defendant Kansas Farm Bureau Services' Motion Pursuant to Rules 50 and 59 of the Federal Rules of Civil Procedure, p. 10. (Doc. 127).

30. Plaintiff's Memorandum in Opposition to Defendant's Motion Pursuant to Rules 50 and 59, p. 11. (Doc. 137).

31. *Id.* at p. 12.

32. Defendant's Exhibit No. 400.

apparent."[33] The plaintiff argues that when Ms. Farley complained about the flower delivery, defendant confronted Mr. Wirtz, even though it had only Ms. Farley's suspicion that the flowers were from him.

The court finds the plaintiff's argument that an investigation is normally undertaken to uncover the unknown has some merit. However, the court agrees with the defendant that in order to investigate, it must have more specific information than the vague allegations provided by the plaintiff. If the plaintiff wanted the defendant to fully investigate his complaints regarding "lies and rumors," he should have provided more concrete facts upon which the defendant could conduct an investigation. Similarly, if the plaintiff felt that Mr. Pullen's response to his complaints was inadequate, he could have contacted the Human Resources director himself.

Therefore, the court finds that based on the evidence presented at trial, defendant did not ignore legitimate complaints of the plaintiff, but rather made a business decision not to pursue vague allegations against an unspecified group of employees.[34] Such action cannot serve as a basis for the finding of liability on the plaintiff's reverse gender discrimination claim.

### iii. January 2000 Actions

 In January 2000, Ms. Farley and her co-worker, Shelley Forrest, reported to Human Resources that plaintiff had sought out Ms. Forrest, showed her a letter he proposed to send to Ms. Farley's husband, and threatened to take his own life. At the same time Ms. Farley turned over to the Human Resources Department a number of handwritten notes allegedly left on her car by the plaintiff while it was parked in the company parking lot. The parties disagreed over the purported reason behind the plaintiff's contact with Ms. Forrest and the alleged threats to his life. Defendant claims that the plaintiff wanted Ms. Farley to speak with him—something defendant states she refused to do at work as a result of the June 1999 memorandum. Plaintiff, on the other hand, claims that the only reason he approached Ms. Forrest was to plead with her and ask, through her, that Ms. Farley stop spreading lies and rumors about him.

Ms. Forrest testified that the plaintiff had spoken to her regarding both topics—wanting Ms. Farley to stop spreading lies and rumors and wanting Ms. Farley to just talk to him. However, Ms. Forrest also testified that, although the plaintiff may have spoken about Ms. Farley's alleged spreading of rumors about him, she did not actually have any knowledge of such rumors and lies being spread. In fact, Ms. Forrest stated "I don't know how I can stop it if [Ms. Farley] didn't do it." Finally, Ms. Forrest testified that she understood the plaintiff's threat to his life to have originated with his frustration that Ms. Farley refused to speak with him at work. Ms. Forrest reported the incident as she best remembered it to defendant's management.

Based on the testimony presented at trial, the court finds that defendant's actions in response to Ms. Farley's and Ms. Forrest's allegations regarding plaintiff's behavior were appropriate. Out of concern for plaintiff's well-being, Mr. Pullen suggested that the plaintiff seek help through an employee assistance program. Because the plaintiff chose to involve a third person in his relationship with Ms.

---

**33.** *Id.* at p. 13.

**34.** Even if Mr. Pullen had passed plaintiff's complaints on to Human Resources, that fact alone would not change the *nature* of plaintiff's allegations.

Farley, defendant advised that the plaintiff take two weeks off work and, upon his return, cautioned the plaintiff against contact with Ms. Farley, directly or indirectly, either on company time or property. Defendant informed the plaintiff that any such further contact may result in disciplinary actions, up to and including termination. Defendant's position and plaintiff's understanding thereof were memorialized in the No Contact Memorandum. Based on the evidence presented at trial, the court finds that defendant's actions surrounding the January 2000 incident could not constitute the basis for plaintiff's claim of reverse gender discrimination.

### iv. Plaintiff's Termination

On April 12, 2000, plaintiff was assigned to travel to either Salina or Hays, Kansas, to provide computer repair services there. For this trip, plaintiff was issued a company cell phone. At 6:52 a.m., before the start of his work day, plaintiff placed a call from this cell phone to Ms. Farley's home. The call never connected. Ms. Farley brought her caller ID device to the defendant's management and reported it as a new contact. Ms. Peggy Goe, head of the Human Resources Department, and Mr. Pullen determined that the call was placed by the plaintiff and requested that he return to the office. After confirming that he indeed attempted to telephone Ms. Farley, Mr. Pullen terminated the plaintiff for violating the No Contact Memorandum, which specified that the plaintiff was to have "no further contact initiated by [the plaintiff], directly or indirectly with Julie Farlie while either of you are on Company time or property unless necessitated by business reasons."[35]

Defendant argues that its determination that the plaintiff violated the No Contact Memorandum was a legitimate justification for his termination. Plaintiff challenges defendant's reason as a mere pretext for unlawful gender discrimination. At trial, defendant tried to persuade the jury that the use of a company-issued cell phone to attempt a call before 7 a.m. from outside of the office fell within the realm of conduct prohibited by the No Contact Memorandum by claiming that plaintiff's conduct constituted contact with Ms. Farley on company time and company property. Plaintiff, in turn, argued that personal use of cellular telephones was allowed; the contact did not actually take place; the attempt to call was on plaintiff's own time; and the attempt was not made on defendant's premises. Therefore, plaintiff asserts the so-called reasons offered by the defendant were merely a pretext for unlawful action.

The jury was instructed that it must find for the defendant if the defendant articulated a legitimate reason for its actions, unless the plaintiff demonstrated that such reason was merely a pretext for unlawful gender discrimination. The jury made a determination that defendant's explanation for terminating the plaintiff was not worthy of belief. Circumstances surrounding the telephone call—namely the time, the place, the policy of allowing personal use of company phones, and the fact that the call did not actually go through—support the jury's determination that the plaintiff was terminated because of his gender. The court cannot independently conclude that defendant's proffered reason for firing the plaintiff was a legitimate reason rather than a pretext for unlawful discrimination in light of this evidence. Defendant's argument that it was entitled to make a business judgment regarding plaintiff's use of the cellular phone does not provide sufficient basis to overcome the jury verdict.

**35.** Defendant's Exhibit No. 410.

#### v. Ms. Farley's Alleged Flirtation With Two Other Co–Workers

Defendant argues that defendant's actions with respect to alleged complaints regarding Ms. Farley's behavior towards two other co-employees, namely Greg Mazouk and Craig Cline, do not provide sufficient basis for plaintiff's claim of reverse gender discrimination. The court excluded testimony from the two individuals named as alleged victims of Ms. Farley's advances due to defendant's belated designation of those individuals as potential witnesses. Therefore, it is unclear to the court whether the jury had sufficient evidence to compare Ms. Farley's alleged behavior vis-a-vis Messrs. Mazouk and Cline with the alleged behavior by the plaintiff. There was, however, evidence presented at trial that defendant did discipline Ms. Farley for some inappropriate behavior toward male co-workers. Because of its conclusions in parts (i) and (iv) above, the court finds it unnecessary to delve into these alleged incidents of harassment, for any such discussion would necessarily rest on mere speculation, not supported by evidence presented at trial.

#### c) Conclusion

■ Despite the defendant's arguments set forth in the instant motion, the court is not convinced that "no reasonable juror, after being instructed on the elements of plaintiff's claims and the standard of proof required, and after considering all the evidence presented at trial,"[36] could not have found the plaintiff's version more compelling. The plaintiff presented sufficient evidence to demonstrate that, but for his gender, his employment would not have been terminated, and defendant's proffered explanation for his termination was pretextual. Evidence of pretext "may, together with the elements of the prima facie case, suffice to show intentional discrimination."[37] Therefore, defendant's renewed motion for judgment as a matter of law with respect to plaintiff's claim of reverse gender discrimination is denied.

#### 3. Plaintiff's Claim for Actual Damages and Costs

Following the jury's finding that defendant intentionally discriminated against the plaintiff on the basis of his gender, the court entered an order awarding plaintiff back pay in the amount of $8,063, with prejudgment interest thereon in the amount of $1,363 and plaintiff's costs and reasonable attorney's fees.[38] In addition, the court sustained the jury's award of compensatory damages in the amount of $1,000 and of pecuniary damages in the amount of $12,000.

Defendant now argues that there is no legally sufficient basis for the court to award back pay, including prejudgment interest, costs and reasonable attorney fees, and to sustain the jury's award of pecuniary damages. The court discusses separately each of these damages awards below.

#### a) Back Pay

In its Memorandum and Order Granting in Part and Denying in Part Plaintiff's Motion for Damages (Doc. 125), the court, utilizing a periodic method of calculating back pay, found that the plaintiff sustained a loss of $7,662 in calendar year 2000 and a

---

36. *Aerotech Resources, Inc., v. Dodson Aviation, Inc., et. al.,* 191 F.Supp.2d 1209, 1216 (D.Kan.2002).

37. *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 147, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), quoting *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

38. Memorandum and Order Granting in Part and Denying in Part Plaintiff's Motion for Damages. (Doc. 125).

loss of $401 in calendar year 2002. To arrive at these figures, the court used evidence presented by the parties at trial. Despite broad discretion allowed the trial court in determining the back pay award, defendant continues to challenge the court's use of the periodic method by repeatedly claiming that "plaintiff earned $11,170.61 more in the period from April 13, 2000 [the date of termination] to June 16, 2003 [the date of trial]." [39] Defendant challenges the court's finding of loss in calendar years 2000 and 2002 as unsupported by evidence presented at trial and not based upon plaintiff's own evidence presented and disclosed. The court finds defendant's arguments unpersuasive.

■■■■ Back pay is an equitable remedy available to a prevailing plaintiff in a Title VII action. The court has wide discretion to award a plaintiff back pay if it deems such award necessary to make the plaintiff whole.[40] In *Albemarle Paper Co. v. Moody*, the Supreme Court held that "given a finding of unlawful discrimination, back pay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination." [41]

■■■■ Back pay is designed to compensate the plaintiff for wages lost between the time of termination and the time of trial.[42] If the calculation is performed over the entire time span between termination and trial, it is sometimes termed the "aggregate" method. In cases where the plaintiff was able to find another job prior to the successful resolution of the issues at trial, a "periodic method" of calculating back pay may also be appropriate.[43] In this case, the plaintiff was terminated on April 13, 2000 and began new employment on July 24, 2000. Pursuant to the Tenth Circuit decision in *Godinet*, the court calculated plaintiff's back pay loss on a periodic basis. Because defendant in the instant motion has not presented any authority that would demonstrate to this court that it abused its discretion by using the periodic method of calculating back pay, the court's ruling on that issue will stand.

■■ Defendant's main contention, however, is that the court incorrectly calculated plaintiff's damages in calendar years 2000 and 2002. Defendant claims that between April 13, 2000, the date of plaintiff's termination, and December 31, 2000, the plaintiff earned $32,907.00 from his new employer, Venator Group. Defendant's figure is based on the plaintiff's response to defendant's Interrogatory No. 4.[44] By contrast, the court found that between April 13, 2000 and December 31, 2000, plaintiff's earnings at Venator Group were $21,000. As explained in greater detail in

**39.** Defendant's Memorandum in Support of Defendant Kansas Farm Bureau Services' Motion Pursuant to Rules 50 and 59 of the Federal Rules of Civil Procedure, p. 19. (Doc. 127)

**40.** *Whatley v. Skaggs Cos.*, 707 F.2d 1129, 1138 (10th Cir.1983) ("title 42 U.S.C. § 2000e–5(g) leaves to the discretion of the trail court the amount of back pay to be awarded a successful plaintiff in an employment discrimination action.") (citations omitted).

**41.** 422 U.S. 405, 421, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975).

**42.** *Wulf v. City of Wichita*, 883 F.2d 842, 871 (10th Cir.1989), citing *Blum v. Witco Chemical Corp.*, 829 F.2d 367, 373 (3rd Cir.1987) ("The relevant time period for calculating an award of back pay begins with wrongful termination and ends at the time of trial.").

**43.** *Godinet v. Management & Training Corp.*, 56 Fed. Appx. 865 (10th Cir.2003).

**44.** Defendant's Trial Exhibit No. 420, p. 5.

the court's July 23, 2003 order, the court believes the plaintiff's response to the above-mentioned interrogatory was in error. Defendant argues that the court has no power to disregard evidence presented at trial and make an assumption that the evidence plaintiff provided was erroneous.

This court did not arbitrarily select the $21,000 to substitute for plaintiff's response to defendant's interrogatory regarding his 2000 salary at Venator Group. Among the evidence presented at trial, defendant introduced into evidence an offer letter to Mr. Wirtz from Venator Group, stating that his annual salary would be $42,000, with a possible bonus of 5%. Using the $42,000 annual salary as a base and assuming that the plaintiff did not receive the 5% bonus in 2000, the court arrived at a monthly salary of $3,500, which, when multiplied by the 6 months the plaintiff worked at Venator Group in 2000, amounts to $21,000, the number utilized by the court in its order. Although defendant has had the plaintiff's offer letter in its possession since long before the trial began, and long before the court made its ruling on the plaintiff's lost wages, defendant has not even attempted to reconcile the discrepancy between plaintiff's interrogatory response and the salary calculation made using the offer letter. The court, on the other hand, pointed out that the discrepancy can be explained if the plaintiff misunderstood the question in Interrogatory No, 4 and added his salary at Venator Group with his salary at KFBS, to arrive at his total salary for 2000. Contrary to defendant's suggestion, the court did not ignore evidence presented at trial. Instead, the court went through and analyzed all the evidence, rather than indiscriminately choosing from among all available information. The court finds that evidence presented at trial was sufficient to demonstrate that in calendar year 2000 the plaintiff sustained a loss of $7,665 as a result of his employment termination by the defendant.

■ Defendant next claims that in calendar year 2002 the plaintiff did not, as the court found, suffer a loss of $401. Here once again the court and the defendant appear to disagree over plaintiff's salary at Venator Group for the year in question. According to the defendant, in 2002 the plaintiff earned $42,973, which number is derived from plaintiff's Form W–2 for that year.[45] However, plaintiff's Federal Income Tax Return Form 1040 shows that plaintiff's income from "wages, salaries, tips, etc." was $42,067, which was the number used by the court in calculating plaintiff's damages.[46] In fact, the amount $42,067 also appears on the plaintiff's W–2 form for 2002 in the box entitled "Wages, tips, other compensation." The number used by defendant appears in the second and third boxes, entitled "Social security wages" and "Medicare wages and tips," respectively.

The conventional measure of an individual's earnings is the number that appears on line 7 entitled "wages, salaries, tips, etc." on the Internal Revenue Service Form 1040. It represents the amount of wages that an individual receives in any given year. It is unclear to the court why the defendant chose to use a different number, a number that not even the Internal Revenue Service considers an appropriate measure of a person's income, to calculate Mr. Wirtz's profit or loss vis-à-vis his hypothetical earnings at KFBS. The court finds that defendant's suggestion that the plaintiff earned $42,973 in 2002 does not properly reflect the plaintiff's wages at Venator Group for that year and declines to use that number to determine

**45.** Defendant's Trial Exhibit No. 419.

**46.** *Id.*

the plaintiff's loss. Therefore, the court finds that in calendar year 2002 the plaintiff sustained a loss of $401 as a result of his termination by the defendant.

 The trial court is granted "considerable discretion ... when devising remedies for Title VII violations." [47] Based on the evidence presented at trial, the court found that, as a result of his termination, the plaintiff lost $8,063 in back wages and $1,363 in prejudgment interest. Defendant has failed to demonstrate that the evidence overwhelmingly points to an exact opposite conclusion—that the plaintiff has suffered no loss in wages as a result of his termination. Therefore, defendant's motion for judgment as a matter of law on the question of back pay is denied.

### b) Attorney's Fees and Costs

In its July 23, 2003 order, the court preliminarily found, subject to specific proof or agreement between the parties, that, as a prevailing party, plaintiff is entitled to recovery of his costs and reasonable attorney's fees.[48] In the instant motion, defendant seeks to show that the plaintiff was not a prevailing party in this matter because he prevailed only on his gender discrimination claim, and lost on the sexual harassment and retaliation claims. Thus defendant seeks a reversal of the court's earlier order or, in the alternative, a re-

duction of the plaintiff's fees and costs award to one-third of his costs because he prevailed only on one-third of his claims.

 The court declines to adopt defendant's interpretation of the term "prevailing party." In the context of Title VII litigation, the plaintiff is considered a "prevailing party" for the purpose of awarding costs and reasonable attorney's fees if such plaintiff prevails on any of his claims and demonstrates that defendant has engaged in conduct prohibited by Title VII.[49] The jury found that defendant intentionally discriminated against the plaintiff on the basis of his gender. As discussed above, the court sustained the jury's finding of reverse gender discrimination. Therefore, the plaintiff is a prevailing party to whom the court could award reasonable attorney's fees and costs.[50]

Although the court finds that the plaintiff, as a prevailing party, is entitled to an award of reasonable attorney's fees and costs, the court declines to assign a sum certain at this time. The plaintiff is directed to file his motion for attorney's fees and costs in accordance with Fed.R.Civ.P. 54(d) and D. Kan. Rule 54.2 within 30 days of this order. Pursuant to D. Kan. Rule 54.2, the parties are directed to confer and attempt to agree on the amount of reasonable costs and attorney's fees and to sub-

---

47. *Estate of Pitre v. Western Electric Co.*, 975 F.2d 700, 704 (10th Cir.1992), *see also Whatley*, 707 F.2d at 1138; *Sears v. Bennett*, 645 F.2d 1365, 1378 (10th Cir.1981) (holding that the court has wide discretion in fashioning remedies to make victims of discrimination whole.).

48. Memorandum and Order Granting in Part and Denying in Part Plaintiff's Motion for Damages, p. 16. (Doc. 125).

49. *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) ("Plaintiffs may be considered 'prevailing parties' for attorneys' fees purposes if they succeed on

any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit.") (citation omitted); *see also Buckhannon Bd. & Care Home v. W. Va. Dept. of Health & Human Res.*, 532 U.S. 598, 603, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001) ("Prevailing party" is one who has been awarded some relief by the court, regardless of the amount of damages awarded.).

50. The court will decide at a later date whether its award of attorney's fees should be adjusted to reflect the jury's finding against the plaintiff on sexual harassment and retaliation claims.

mit such calculation to the court. In the event the parties are unable to come to such an agreement, the plaintiff is directed to file the appropriate motion and memorandum supported by time records, affidavits, or other evidence in accordance with D. Kan. Rule 54.2.

### c) Pecuniary Damages

At the conclusion of the trial, the jury awarded the plaintiff $12,000 in pecuniary damages. Defendant seeks to overturn this award for insufficiency of evidence. Defendant argues that with the exception of $800 in counseling bills, the plaintiff has not sustained any out-of-pocket expenses that may be compensable under this category of damages. The court agrees.

In response to defendant's motion, plaintiff argues that "Mr. Wirtz testified about substantial out of pocket losses as a result of his firing." [51] Plaintiff also points to his answers to defendant's Interrogatory No. 5 as evidence of his pecuniary losses.[52] However, as defendant correctly states in its reply,[53] with the exception of the counseling expenses, the plaintiff did not substantiate at trial any losses outlined in his answer to Interrogatory No. 5. Although plaintiff, in his direct testimony, claimed supposed out-of-pocket losses—his COBRA insurance payments—under cross examination he admitted that his new employer, the Venator Group, actually reimbursed him for this expense.

With regard to the recovery of pecuniary damages, a plaintiff may be awarded actual damages only; those claimed damages that are speculative, remote, or uncertain may not form the basis of a lawful judgment. "The actual damages which will sustain a judgment must be established, not by conjectures or unwarranted estimates of witnesses, but by facts from which their existence is logically and legally inferable. The speculations, guesses, estimates of witnesses, form no better basis of recovery than the speculations of the jury themselves." [54]

The court finds that, with the exception of $800 in counseling fees, the plaintiff failed to provide any evidence regarding his out-of-pocket expenses. Therefore, the jury award of $12,000 cannot stand, as it reflects nothing more than a speculative guess and conjecture by the jurors.

Defendant has demonstrated that with respect to pecuniary damages, the evidence presented at trial overwhelmingly supports its position that the plaintiff failed to prove pecuniary damages in the amount awarded by the jury. Therefore, defendant's motion for judgment as a matter of law on the issue of pecuniary damages is granted and plaintiff's award for his out-of-pocket losses is reduced to $800.

### 4. Plaintiff's Claim for Punitive Damages.

Following its finding that defendant intentionally discriminated against the plaintiff on the basis of his gender in violation of Title VII, the jury awarded the plaintiff $20,000 in punitive damages. Defendant seeks to overturn this award on the basis of insufficiency of evidence. Defendant argues (1) that the plaintiff did not establish that management acted with malice or

---

**51.** Plaintiff's Memorandum in Opposition to Defendant's Motion Pursuant to Rules 50 and 59, p. 17. (Doc. 137).

**52.** Defendant's Trial Exhibit No. 420, p. 5.

**53.** Defendant's Reply Brief in Support of Defendant Kansas Farm Bureau Services, Inc.'s Motion Pursuant to Rules 50 and 59 of the Federal Rules of Civil Procedure. (Doc. 142).

**54.** *United States v. Griffith, Gornall & Carman, Inc.*, 210 F.2d 11, 13 (10th Cir.1954), quoting *Central Coal & Coke Co. v. Hartman*, 111 F. 96, 98 (8th Cir.1901).

reckless disregard for plaintiff's federally protected rights, and (2) the jury ignored evidence that defendant acted in good faith to comply with the law by adopting policies and procedures designed to prohibit discrimination and by effectively enforcing such policies and procedures.

The Civil Rights Act of 1991 (the "Act") provides that a court may award punitive damages to a plaintiff in employment discrimination suit upon proof that the defendant engaged in "a discriminatory practice or discriminatory practices with malice or reckless indifference to the federally protected rights of an aggrieved individual." [55] The burden of proof required of a plaintiff seeking punitive damages is higher than the burden of proof to qualify for compensatory damages. The Supreme Court confirmed that the Act sets a higher threshold for punitive damages in its 1999 decision in *Kolstad v. American Dental Association:*

> The very structure of § 1981a suggests a congressional intent to authorize punitive awards in only a subset of cases involving intentional discrimination. Section 1981a(a)(1) limits compensatory and punitive awards to instances of intentional discrimination, while § 1981a(b)(1) requires plaintiffs to make an additional "demonstration" of their eligibility for punitive damages. Congress plainly sought to impose two standards of liability—one for establishing a right to compensatory damages and another, *higher* standard that a plaintiff must satisfy to qualify for a punitive award.[56]

Having concluded that Congress sought to impose a higher standard for recovery of punitive damages, the Supreme Court proceeded to define that higher standard. The Court stated that the "terms 'malice' and 'reckless' ultimately focus on the actor's state of mind." [57] However, "while egregious misconduct is evidence of the requisite mental state, ... § 1981a does not limit plaintiffs to this form of evidence, and the section does not require a showing of egregious or outrageous discrimination independent of the employer's state of mind." [58] Instead, the Supreme Court found that Congress, in drafting section 1981a of the Act, focused specifically on the employer's state of mind to "narrow the class of cases for which punitive awards are available to a subset of those involving intentional discrimination." [59] Thus, the Court concluded that to be liable for punitive damages, the employer must have the "knowledge that it may be acting in violation of federal law," rather than an "awareness that it is engaging in discrimination." [60] "[A]n employer must at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable in punitive damages." [61]

Once a Title VII plaintiff has demonstrated malice or reckless disregard for his or her federally protected rights, the plaintiff must impute liability for punitive damages to the employer. In *Kolstad,* the Supreme Court observed that to resolve the question of liability, the Congress "has directed federal courts to interpret Title VII based on agency principles." [62] Under the Restatement of Agency, punitive dam-

---

**55.** 42 U.S.C.1981a(b)(1).

**56.** 527 U.S. 526, 534, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999) (emphasis added).

**57.** *Kolstad,* 527 U.S. at 535, 119 S.Ct. 2118.

**58.** *Id.*

**59.** *Id.*

**60.** *Id.*

**61.** *Id.* at 536, 119 S.Ct. 2118.

**62.** *Kolstad,* 527 U.S. at 541, 119 S.Ct. 2118 (citations omitted).

ages may be awarded against the principal, in this case the employer entity, if its agent "was employed in a managerial capacity and was acting in the scope of employment." [63] However, the agency principles must be modified to account for the possibility that a management level employee acts contrary to the employer's good faith efforts to comply with Title VII. The Supreme Court felt that holding employers strictly liable despite their efforts to educate themselves and implement programs and policies to prevent discrimination in the workplace would dissuade employers from implementing such programs and run contrary to Title VII's primary objective—to avoid harm.[64] Therefore, the Supreme Court found that punitive damages would not be appropriate where "an employer has undertaken such good faith effort at Title VII compliance" because "it 'demonstrates that it never acted in reckless disregard of federally protected rights.' " [65]

> Recognizing Title VII as an effort to promote prevention as well as remediation, and observing the very principles underlying the Restatement's strict limits on vicarious liability for punitive damages, we agree that, in the punitive damages context, an employer may not be vicariously liable for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employer's "good faith efforts to comply with Title VII." [66]

 As noted above, the jury awarded the plaintiff $20,000 in punitive damages. Defendant argues that the evidence presented at trial does not support this award. Guided by the legal standards set forth above, the court must first decide whether the plaintiff has demonstrated that defendant acted with malice or reckless disregard for his federally protected rights.[67] In reviewing the punitive damage award, the court must consider all the evidence in the light most favorable to the plaintiff and may reject the jury's conclusion "only if the evidence points one way and is susceptible to no reasonable inferences supporting the nonmoving party." [68] The court may not weigh the evidence and pass on the credibility of witnesses or substitute its conclusions for that of the jury.

The main crux of defendant's motion for judgment as a matter of law on plaintiff's punitive damages claim is that defendant did not act in reckless disregard of plaintiff's federally protected right to be free from gender discrimination, but rather made a string of business decisions that may have had the effect of discriminating against the plaintiff. Defendant turns to evidence presented at trial to show that it attempted to work with the plaintiff and gave the plaintiff a number of chances to improve his conduct before eventually terminating him for an alleged violation of a company directive. Defendant also points to a complete absence of egregious conduct on the part of its management employees

---

63. *Kolstad,* 527 U.S. at 542–43, 119 S.Ct. 2118, quoting Restatement (Second) of Agency, § 217 C.

64. *Kolstad,* 527 U.S. at 545, 119 S.Ct. 2118.

65. *Id.* at 544, 119 S.Ct. 2118.

66. *Id.* at 545, 119 S.Ct. 2118 (citations omitted).

67. In this case, the imputation appears uncontested, as the allegations of recklessness and maliciousness are being leveled against defendant's management employees in charge of setting and enforcing anti-discriminatory policies.

68. *Yearous v. Niobrara County Memorial Hosp.,* 128 F.3d 1351, 1353 (10th Cir.1997), citing *Haines v. Fisher,* 82 F.3d 1503, 1510 (10th Cir.1996).

to support any possible claim of malice by the defendant.

The plaintiff responds that because the jury was properly instructed on the question of punitive damages, it must have found malice or reckless disregard for plaintiff's federally protected rights and, therefore, its finding of punitive damages should not be disturbed.

The court appreciates the plaintiff's position that a jury verdict should not be ignored; however, as defendant points out, plaintiff's argument appears to lead to a conclusion that a jury verdict can never be overturned by a court on a motion for judgment as a matter of law. This position contradicts the very existence of Fed. R.Civ.P. 50(b). When presented with a motion for judgment as a matter of law, the court must review the jury's conclusions to determine whether the evidence presented at trial is sufficient to support the verdict. The court finds that such review is particularly appropriate in the case of a punitive damages award, because of a likelihood of confusion on the part of the jury regarding the heightened standard required by the Supreme Court for the imposition of punitive damages in intentional discrimination cases.

Defendant, arguing that the jury award of $20,000 was erroneous, cites a number of recent Tenth Circuit cases to demonstrate the type of circumstances that merit the imposition of punitive damages. The plaintiff responds by stating that he "presented evidence that defendant's representatives knew the law, they knew they could not discriminate against plaintiff because of his gender and did so in reckless disregard for Mr. Wirtz's protected federal rights."[69] Plaintiff fails to address any of the cases cited by the defendant or to demonstrate that conduct found objectionable by the Tenth Circuit in those instances was also present in the plaintiff's case. A party may not rest its case on summary allegations and conclusory statements. The court finds the cases cited by the defendant most instructive.

In *Equal Employment Opportunity Commission v. Wal–Mart Stores, Inc.,* the Tenth Circuit upheld the imposition of punitive damages against an employer who, knowing that the plaintiff was hearing impaired and required an interpreter to attend meetings and training sessions, refused to provide an interpreter for a mandatory training session and then demoted and eventually fired the plaintiff for refusing to attend the session without the interpreter.[70] By contrast, the Tenth Circuit in *The Guides, Ltd. v. Yarmouth Group Prop. Mgt., Inc.,* reversed the district court's denial of defendant's motion for judgment as a matter of law as to a punitive damage award because the plaintiff failed to prove that the defendant acted with "malicious, willful or gross disregard of a plaintiff's rights over and above intentional discrimination."[71]

In *Yarmouth,* the court considered a claim by a minority-owned store called "Africa House" that the new management company managing the mall complex in which Africa House was located discriminated against the store on the basis of race and failed to renew the store's lease in violation of 42 U.S.C. § 1981. The Tenth Circuit upheld the jury's determination that defendants discriminated against Africa House on the basis of race, but found insufficient evidence to support the puni-

---

69. Plaintiff's Memorandum in Opposition to Defendant's Motion Pursuant to Rules 50 and 59, p. 21.

70. 187 F.3d 1241 (10th Cir.1999).

71. 295 F.3d 1065, 1077 (10th Cir.2002), citing *Hampton v. Dillard Dep't Stores, Inc.,* 247 F.3d 1091, 1115 (10th Cir.2001).

tive damage award. Because a showing of malicious and willful discrimination was required, the court held that the heightened standard for punitive damages "cannot be satisfied by a showing of intentional discrimination alone. Otherwise, every jury verdict in a successful § 1981 or § 1982 claim would include an award of punitive damages." [72]

To evaluate whether the plaintiff showed gross disregard for its rights "over and above intentional discrimination," the court in *Yarmouth* considered the allegations that the defendants refused to enter into rent negotiations with Africa House; made numerous misrepresentations concerning the lease space, including telling the owner of Africa House that a person was taking measurements in the store for insurance purposes when in reality they were preparing for a new lessee; drew up blueprints of the mall leaving out Africa House; and made comments that the store was not glamorous enough, did not "mix well" with other clients, should change its name, and "had to go." Notwithstanding these misrepresentations and calculated efforts on the part of the defendant in *Yarmouth* to drive the store from the mall, the Tenth Circuit found that the evidence was not sufficient to justify the punitive damages award: "In examining the evidence, we are not persuaded that the plaintiffs proved that defendants acted in malicious, willful or gross disregard of their rights. While the indirect evidence in this case is sufficient to establish that the defendants intentionally discriminated against the plaintiffs on the basis of race, there is no evidence which would show that the defendants acted in malicious or willful disregard of Africa House's rights." [73]

In support of the argument that the jury award of punitive damages should be allowed to stand in this case, plaintiff simply states that he "presented evidence that defendant's representatives knew the law, they knew they could not discriminate against plaintiff because of his gender and did so in reckless disregard for Mr. Wirtz's protected federal rights." [74] However, this statement is not, by itself, evidence of any particular action that defendant's management took in the face of a perceived risk of violating plaintiff's federally protected rights. There was simply no evidence presented at trial showing that defendant's management employees possessed the requisite state of mind to justify the imposition of punitive damages. By contrast, throughout trial defendant's management employees testified about their desire to help the plaintiff work through the difficult period in his personal and professional life.

This case is a clear example of a situation in which a plaintiff suffered from intentional discrimination, but the defendant did not possess the requisite mental state for the imposition of punitive damages. Defendant disciplined the plaintiff following a series of complaints about the plaintiff by his co-employee, Ms. Farley, and disciplined Ms. Farley following a series of complaints by the plaintiff about Ms. Farley. Defendant warned the plaintiff about the consequences of ignoring a company directive—the No Contact Memorandum—and terminated the plaintiff when it deemed that he violated such directive. The plaintiff presented sufficient indirect evidence to enable the jury to conclude gender discrimination existed, defendant's reason for terminating him was pretextual and, therefore, the termination was unlawful. Proof of intentional discrimination en-

---

**72.** *Yarmouth,* 295 F.3d at 1077.

**73.** *Id.*

**74.** Plaintiff's Memorandum in Opposition to Defendant's Motion Pursuant to Rules 50 and 59, p. 21. (Doc. 137).

titles the plaintiff to compensatory damages for his injury. However, Congress intended punitive damages to apply only to a subset of intentional discrimination cases, and the Tenth Circuit has limited the availability of such damages to instances of most egregious discrimination. Defendant's actions in this case do not amount to malicious and willful disregard of plaintiff's protected rights to justify imposition of punitive damages.

■ Although the court has concluded that imposition of punitive damages is not appropriate in this case due to the insufficiency of evidence demonstrating malice or willful disregard for plaintiff's federally protected rights, the court will, for the sake of thoroughness, discuss whether defendant could benefit from the good faith compliance defense announced by the Supreme Court in *Kolstad.*

■ Under *Kolstad,* even if the plaintiff were successful in showing that the defendant's managerial employees recklessly disregarded his federally-protected rights while acting within the scope of their employment, "punitive damages will not be awarded if the employer shows that it engaged in good faith efforts to comply with Title VII." [75] The Court found that such a defense was proper in light of the common law limitations on vicarious liability for punitive damages. [76] Equally important to the Court was the notion that "allowing vicarious punitive liability, regardless of compliance efforts, would in effect not only reduce an employer's incentive to implement anti-discrimination programs, but also penalize those employers who do educate themselves and their employees." [77]

In *EEOC v. Wal–Mart Stores, Inc.,* the Tenth Circuit Court of Appeals noted that "*Kolstad* provides us no definitive standard for determining what constitutes good faith compliance" with Title VII. [78] However, the court found that, at a minimum, an employer must adopt anti-discrimination policies and make a good faith effort to educate its employees about these policies and Title VII's prohibitions. [79] "*Kolstad* itself suggests that the good-faith-compliance standard requires an employer to make 'good faith efforts to *enforce* an anti-discrimination policy.' " [80] Thus, "even if an employer-defendant adduces evidence showing it maintains on paper a strong non-discrimination policy and makes good faith efforts to educate its employees about that policy and Title VII, a plaintiff may still recover damages if she demonstrates the employer failed to adequately address Title VII violations of which it was aware." [81]

Defendant in its motion for judgment as a matter of law argues that it "presented evidence at trial that it acted in good faith to comply with the law by adopting policies and procedures that were designed to prohibit discrimination." [82] Furthermore, defendant argues that it did not fail effectively to enforce its anti-discriminatory

**75.** *Davey v. Lockheed Martin Corp.,* 301 F.3d 1204, 1209 (10th Cir.2002), citing *Kolstad,* 527 U.S. at 545–46, 119 S.Ct. 2118.

**76.** *Kolstad,* 527 U.S. at 544, 119 S.Ct. 2118.

**77.** *Davey,* 301 F.3d at 1209, citing *Kolstad,* 527 U.S. at 544–45, 119 S.Ct. 2118.

**78.** *EEOC,* 187 F.3d at 1248.

**79.** *Id.* at 1248–49.

**80.** *Cadena v. The Pacesetter Corp.,* 224 F.3d 1203, 1210 (10th Cir.2000), quoting *Kolstad,* 527 U.S. at 546, 119 S.Ct. 2118.

**81.** *Id.*

**82.** Defendant's Memorandum in Support of Defendant Kansas Farm Bureau Services' Motion Pursuant to Rules 50 and 59 of the Federal Rules of Civil Procedure, p. 26. (Doc. 127).

policies and procedures, but rather carried out its legitimate business decisions on how to handle each situation that arose with respect to the plaintiff and Ms. Farley. In response, the plaintiff states that defendant "failed and refused to follow its own policies that require it to investigate and take any action against Farley. When it came to Farley's sexual harassment of male employees, defendant was deaf and dumb. On the other hand, plaintiff's evidence was that defendant reacted in a vicious manner towards plaintiff each time that anything resembling a complaint against him arose." [83]

In light of the Supreme Court's admonition that Title VII purposes may be thwarted by automatic awards of punitive damages against employers who demonstrate good faith compliance with Title VII, the court must decide whether evidence presented at trial shows that KFBS implemented anti-discrimination policies and procedures, educated its employees regarding Title VII prohibitions, and effectively and consistently enforced its own policies and procedures.

At trial, defendant presented ample evidence that it had in place policies and procedures designed to prohibit discrimination. Defendant's Exhibit No. 400 was a reprint of the Associate Handbook containing an entire section discussing sexual and discriminatory harassment and violence in the workplace.[84] Testimony by both Ms. Goe and the plaintiff established that all employees, including the plaintiff, were provided with a copy of the Associate Handbook.[85] Evidence also was presented at trial demonstrating that defendant provided its employees with sexual harassment awareness training and could force its employees to re-attend such training as necessary.[86]

Based on the evidence presented at trial, the court finds that defendant had adopted anti-discrimination policies and made a good faith effort to educate its employees about these policies and Title VII prohibitions. Therefore, KFBS can benefit from the "good faith compliance" defense set out in *Kolstad* if it demonstrates [87] that it made good faith efforts to enforce its anti-discrimination policies by adequately addressing Title VII violations "of which it was aware." [88]

Having reviewed all the evidence, the court concludes that the defendant did precisely that. Defendant presented evidence at trial of two situations involving the plaintiff's use of office equipment to send personal messages to two co-workers in 1993. Although the plaintiff argued at every stage of this case that evidence of these incidents should have been expunged from his record, the court nonetheless

83. Plaintiff's Memorandum in Opposition to Defendant's Motion Pursuant to Rules 50 and 59, pp 21–22. (Doc. 137).

84. Defendant's Exhibit No. 400, p. 27.

85. See also Defendant's Exhibit No. 401, Employee Acknowledgment Form.

86. Defendant's Exhibit No. 424. *See also* Defendant's Exhibit No. 400 (The Associate Handbook containing defendant's equal employment opportunity policy and harassment policy) and Defendant's Exhibit No. 401 (Plaintiff's acknowledgment of receipt of the Associate Handbook).

87. The Tenth Circuit Court of Appeals in *Cadena* stated that "it is unclear whether the good-faith-compliance standard set out in *Kolstad* represents an affirmative defense on which the defendant bears the burden of proof or whether the plaintiff must disprove the defendant's good faith compliance with Title VII." 224 F.3d at 1209 n. 4. The parties did not address the burden of proof issues in their briefs and the court will assume that the burden rests with the defendant to prove its good-faith-compliance with Title VII as an affirmative defense.

88. *Cadena,* 224 F.3d at 1210.

finds it instructive on the question of how defendant handled complaints of Title VII violations. It appears that following the complaints by the two female co-workers, defendant promptly investigated the matters and cautioned the plaintiff regarding the implications of sending unwanted communications to other employees.[89] Similar steps were taken by the defendant when Ms. Farley and the plaintiff leveled complaints against each other for inappropriate office conduct. Defendant investigated the matter and issued identical memoranda to the two employees reminding them to maintain professional attitude at work.[90]

The plaintiff argues that defendant's investigation of his charges against Ms. Farley was superficial and does not support defendant's assertions of good faith. Plaintiff states that "[w]hen it came to Farley's sexual harassment of male employees, defendant was deaf and dumb." However, the court finds that this is not an accurate characterization of defendant's actions toward Ms. Farley. Defendant argued at trial that it took all actions it reasonably could regarding Ms. Farley given the somewhat vague nature of plaintiff's complaints about her.[91] As defendant correctly points out, the fact that the plaintiff disagreed with the results of these investigations does not automatically subject the plaintiff to punitive damages. Plaintiff's own exhibits demonstrate that the defendant investigated allegations of Ms. Farley's inappropriate conduct toward Messrs. Cline and Mazouk.[92] Finally, defendant introduced into evidence a memorandum to Ms. Farley in which she was once again reprimanded for her conduct

toward male co-workers and required to re-attend sexual harassment awareness training.[93] Contrary to the plaintiff's assertions that defendant did nothing when it came to investigating Ms. Farley, the evidence shows that defendant's actions with respect to investigating and punishing Ms. Farley for a number of her alleged infractions echo the actions it took when faced with similar complaints regarding plaintiff's behavior.

In light of all the evidence presented at trial, the court finds that defendant did not ignore its established policies and procedures, and fully investigated all alleged Title VII violations of which it was aware. As such, defendant has demonstrated that it complied in good faith with Title VII and the imposition of punitive damages would be improper under the standards set forth by the Supreme Court in *Kolstad.* Because the defendant did not act with malice or reckless disregard for plaintiff's federally protected rights and because defendant complied in good faith with Title VII, the court grants defendant's motion for judgment as a matter of law on the plaintiff's punitive damages claim and vacates the jury's $20,000 award.

## B. Motion for New Trial

### 1. Legal Standards

Pursuant to Fed.R.Civ.P. 59(a), a "new trial may be granted to all or any of the parties on all or part of the issues . . . in an action in which there has been a trial by jury. . . ." Motions for a new trial are committed to the sound dis-

---

89. Defendant's Exhibit No. 403.

90. Defendant's Exhibit No. 405.

91. The fact that defendant may not have considered plaintiff's complaints regarding Ms. Farley to be serious during the initial meeting with the plaintiff and Ms. Farley following the

flower incident does not, in the court's view, mean that *all* allegations of Ms. Farley's misbehavior went unnoticed and unpunished.

92. Plaintiff's Exhibit Nos. 10–13.

93. Defendant's Exhibit No. 424.

cretion of the trial court.[94] They are "not regarded with favor and should only be granted with great caution." [95] A motion for a new trial "should be granted when the court believes the verdict is against the weight of the evidence, prejudicial error has occurred, or substantial justice has not been done." [96]

■ A new trial based upon an error of law is unwarranted unless that error affected the substantial rights of the parties.[97] "The party seeking to set aside a jury verdict must demonstrate trial error which constitutes prejudicial error or that the verdict is not based on substantial evidence." [98] The court should "ignore errors that do not affect the essential fairness of the trial." [99] Where a jury's verdict is challenged as contrary to the evidence, the court's "inquiry focuses on whether the verdict is clearly, decidedly or overwhelmingly against the weight of the evidence." [100]

As an alternative relief to its motion for judgment as a matter of law, defendant seeks a new trial on the plaintiff's claims of reverse gender discrimination and certain damages. Defendant proposes three separate grounds in support of its motion for a new trial. First, defendant argues that the court improperly instructed the jury on the elements of reverse gender discrimination. Second, defendant argues that errors committed at trial cumulatively require a new trial. And third, defendant states that plaintiff's failure to meet his burden on the gender discrimination and punitive damages claims requires a new trial. Additionally, defendant requests that the court alter the back pay award under Fed.R.Civ.P. 59(e). The court will address each of defendant's contentions in turn.

## 2. Jury Instructions Nos. 21, 22, and 22A.

■ In this section, defendant renews its argument that the court did not properly instruct the jury on the appropriate elements and burdens of proof for a reverse discrimination claim. Reversal of a jury verdict is "warranted when a deficient jury instruction is prejudicial." [101] As discussed in greater detail above, the court instructed the jury that they could find for the plaintiff if the plaintiff demonstrated that race was a motivating factor in the defendant's decision to terminate him. Defendant argues that the court should have utilized a "but for" standard, and that failure to submit the "but for" standard to the jury "was error pursuant to *Notari, Sims* and *Honce.*" [102]

**94.** *McDonough Power Equip., Inc. v. Greenwood.*, 464 U.S. 548, 556, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984), *see also Hinds v. Gen. Motors Corp.*, 988 F.2d 1039, 1046 (10th Cir. 1993).

**95.** *United States v. Kelley*, 929 F.2d 582, 586 (10th Cir.1991).

**96.** *Heyen v. United States*, 731 F.Supp. 1488, 1489 (D.Kan.1990), citing *Holmes v. Wack,* 464 F.2d 86, 88–89 (10th Cir.1971).

**97.** Fed.R.Civ.P. 61; *see also Heyen*, 731 F.Supp. at 1489.

**98.** *White v. Conoco, Inc.*, 710 F.2d 1442, 1443 (10th Cir.1983).

**99.** *McDonough Power Equip.*, 464 U.S. at 553, 104 S.Ct. 845.

**100.** *Black v. Hieb's Enters., Inc.*, 805 F.2d 360, 363 (10th Cir.1986) (citations omitted).

**101.** *Coleman v. B–G Maintenance Mgmt. of Colo.*, 108 F.3d 1199, 1202. (10th Cir.1997), citing *Fitzgerald v. Mountain States Tel. & Tel. Co.*, 68 F.3d 1257, 1262 (10th Cir.1995).

**102.** Defendant's Memorandum in Support of Defendant Kansas Farm Bureau Services' Motion Pursuant to Rules 50 and 59 of the Federal Rules of Civil Procedure, p. 30. (Doc. 127).

The court will not repeat here its analysis of the two different formulations of the jury instructions that could have been used in this case. As the court noted in Section (A)(2)(a) above, the Tenth Circuit decision in *Notari* did not mandate any specific or particular wording for reverse gender discrimination instructions. The jury instructions as a whole conveyed to the jurors that the plaintiff should prevail if he demonstrated, by the preponderance of the evidence, that defendant terminated the plaintiff because of his gender. The jury understood its charge and the defendant has not presented sufficient evidence to demonstrate that the verdict it reached was so contrary to the evidence presented as to require a new trial.

Furthermore, under the particular facts of this case, the instructions submitted to the jury and the alternative "but for" instruction proposed by the defendant support only one conclusion—that plaintiff was terminated because of his gender. The Supreme Court directs the courts to "ignore errors that do not affect the essential fairness of the trial." [103] Because either formulation of the instructions would lead to the outcome actually reached at trial, the court finds that its choice to use Instructions Nos. 21, 22 and 22A instead of the "but for" instruction proposed by the defendant had no effect on the substantial rights of the parties or the essential fairness of the trial. As such, defendant's motion for a new trial on the basis of erroneous jury instructions is denied.

### 3. Alleged Cumulative Errors at Trial.

Defendant next argues that a number of errors at trial so prejudiced the defendant as to require a new trial. These errors include: (1) Evidentiary ruling that Craig Cline and Greg Mazouk could not testify;

(2) Plaintiff's testimony regarding "rumors" plaintiff allegedly heard from Penny Billington without Ms. Billington being present and called to testify; (3) Plaintiff's presentation to the jury of alleged e-mails that were never submitted to defendant in discovery and were not disclosed to defendant at any time before or during trial; and (4) Plaintiff's attempted playing of a dictaphone recording of a message the contents of which were not disclosed to the defense counsel before or during trial.

During the pretrial of this case, the parties were informed that any witnesses not previously identified by the parties during discovery may be precluded from testifying.[104] Both parties, plaintiff and defendant, included on their respective final witness and exhibit lists individuals whose names have never before been disclosed as potential witnesses. In the case of the plaintiff, the witness was plaintiff's neighbor, Jeff McIntyre. In the case of the defendant, the witnesses were two of defendant's employees, Craig Cline and Greg Mazouk. The court precluded either party from calling these witnesses on the grounds that they have not been disclosed prior to their names appearing in the final witness and exhibit list. Defendant now claims that the court's ruling to preclude testimony by Messrs. Cline and Mazouk was an error so prejudicial to the defendant as to require a new trial. The court disagrees.

When the name of Jeff McIntyre first appeared on the plaintiff's final witness and exhibit list, defendant objected on the grounds that this person had never been identified as a witness, although during the course of discovery his identity and potential testimony were disclosed to the defendant. Unlike the defendant, the plaintiff failed to immediately object to the inclu-

---

**103.** *McDonough Power Equip.*, 464 U.S. at 553, 104 S.Ct. 845.

**104.** Pretrial Order, pp. 34–35. (Doc. 52).

sion of Messrs. Cline and Mazouk on the grounds that their names had not been previously disclosed. However, before these two witnesses were due to testify, the plaintiff realized his mistake and objected to the inclusion of their testimony on the same grounds as the court used to exclude the testimony of Mr. McIntyre. Defendant argued then and continues to argue now that the plaintiff waived his objections to this testimony and that defendant relied on this waiver to its detriment when it promised the jury that they would hear from these two witnesses.

■ The court recognizes that the plaintiff should have objected to the inclusion of Messrs. Cline and Mazouk when the final witness and exhibit lists were first disclosed. However, exclusion of their testimony was not so prejudicial to the defendant's case as to require the court to now order a new trial. Defendant claims Messrs. Cline and Mazouk would have testified that Ms. Farley did not sexually harass them, that they made no complaints about her, and that the defendant initiated the investigation into Ms. Farley's behavior towards them. However, defendant was able to present essentially the same evidence through testimony of Ms. Peggy Goe, the Human Resources Director, who initiated the investigations regarding Ms. Farley's alleged behavior towards Messrs. Cline and Mazouk. There is no basis for the court to conclude that the jury disbelieved Ms. Goe's testimony that Ms. Farley did not engage in sexual harassment since the jury found for the defendant on the plaintiff's sexual harassment claim.

The jury found that defendant's reason for terminating the plaintiff was pretextu-al. This finding, however cast, has nothing to do with defendant's investigation of other claims of sexual harassment by Ms. Farley. The court simply does not see how exclusion of Craig Cline and Greg Mazouk prejudiced the defendant on the plaintiff's gender discrimination claim.[105] Finally, the court finds that it would have been error to allow defendant to proceed with witnesses who were not disclosed prior to their inclusion in the final witness and exhibit list while precluding, at defendant's request, the plaintiff from presenting a similarly-situated witness on his behalf.

■ Defendant next argues that it was prejudiced when the plaintiff repeatedly disregarded the court's ruling that any statements attributed to Ms. Penny Billington were hearsay and not admissible at trial. Defendant claims that because the plaintiff testified over the defendant's objections, he was able to present to the jury evidence that should have been properly excluded. It is the nature of our court's proceedings that a party may, sometimes, answer a question that is posed before the opposing party is able to articulate its objection, and the jury is therefore able to hear evidence that should not be admitted. To remedy the situation, this court instructed the jury to disregard any statement to which there was an objection that was sustained by the court. This directive was reinforced in the court's formal instructions given at the conclusion of the presentation of the evidence.[106]

■ The "central assumption of our jurisprudence is that juries follow the instructions they receive."[107] Absent evidence to the contrary, the court must assume that the jury understood to dis-

---

**105.** Because the court ruled in the preceding section that defendant's behavior did not warrant the imposition of punitive damages, it is not necessary to address here the question of whether the inclusion of Messrs. Cline and Mazouk's testimony would have buttressed defendant's position that it did not act with malice or reckless disregard for Mr. Wirtz's federally protected right to be free from reverse gender discrimination.

**106.** Jury Instruction No. 2.

**107.** *United States v. Castillo,* 140 F.3d 874, 884 (10th Cir.1998) (citing *Marshall v. Lon-*

regard any comments the plaintiff made regarding "rumors" reported to him by Ms. Billington. Therefore, the court finds that no error was committed when it sustained the objections regarding Ms. Billington's statements and relied on the jury to follow its instructions to disregard plaintiff's comments.

 The court will consider defendant's last two "errors" together, as they relate to the testimony of the same witness, Mr. Kirk Farley, and involve essentially the same conduct by the plaintiff's counsel and the same ruling by the court. During the cross examination of Mr. Kirk Farley, Ms. Farley's husband, plaintiff's counsel held up a document with the implication that the document in his hand was a communication between Mr. Farley and the plaintiff. Defendant objected to this use of the document because the existence of any such alleged communication was never disclosed to the defendant or made part of the record for the trial. During a bench conference the court admonished the plaintiff's counsel regarding the use of any document not previously disclosed to the opposing counsel, even if such use was for impeachment purposes only. The plaintiff's counsel, abandoning the document, proceeded to question Mr. Farley regarding an alleged telephone message left on Mr. Wirtz's answering machine, containing inappropriate language. When Mr. Farley denied leaving such message, plaintiff's counsel held up a tape recorder and began to play a recording containing words allegedly used by Mr. Farley. Defendant im-

mediately objected. The playback of the recording was immediately stopped, an *in camera* hearing conducted, and the court concluded that the recording could not be used for any purpose. No further attempts were made by the plaintiff to use the recording. Now defendant argues that plaintiff's counsel's violation of the court's previous ruling regarding undisclosed testimony so prejudiced the defendant as to require a new trial.

The court has carefully reviewed the transcripts from the relevant portions of the trial and finds that the plaintiff's counsel's conduct during Mr. Farley's examination, while inappropriate, does not provide sufficient grounds for defendant's motion for a new trial.[108] Plaintiff's unmistakable goal during this portion of Mr. Farley's cross examination was to paint him a liar and discredit him in front of the jury. Without a doubt, trustworthiness and good moral character of its witnesses were important to the defendant. However, this case involves a lawsuit by a former employee against his employer for violation of Title VII. Mr. Farley was not the defendant's most important witness. In fact, Mr. Farley's testimony was only marginally related to only one of the issues of this case—the question of whether Ms. Farley was sexually harassing the plaintiff. The jury found for the defendant on this very issue. Therefore, the court finds that the plaintiff's counsel's behavior during Mr. Farley's cross examination does not provide sufficient grounds to sustain defendant's motion for a new trial.[109]

*berger,* 459 U.S. 422, 438, n. 6, 103 S.Ct. 843, 74 L.Ed.2d 646 (1983)).

**108.** *U.S. v. Baresh,* 790 F.2d 392, 401–402 (5th Cir.1986) (The court found that a trial court's citation of defendant's counsel for contempt of court in the presence of a jury after that counsel repeatedly ignored prior court orders regarding counsel's line of questioning did not require a new trial.).

**109.** *Leidel v. Ameripride Servs.,* 291 F.Supp.2d 1241, 1248–49 (D.Kan.2003) (Finding that, although witness credibility was "critical" to the jury's evaluation of the case, a motion for a new trial on the basis of counsel misbehavior that may have affected such credibility may not be granted absent a showing of actual prejudice.). *See also Kotteakos v. U.S.,* 328 U.S. 750, 764–65, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) ("If, when all is said and done,

#### 4. Plaintiff's Burden of Proof

Defendant's last argument in support of a motion for a new trial comes in the form of a general statement that the plaintiff failed to prove the elements of his reverse gender discrimination claim and his punitive damages claim. Viewing the evidence in the light most favorable to the plaintiff, the court concluded that the plaintiff presented sufficient evidence to demonstrate that, but for his gender, he would not have been terminated and that the defendant's proffered explanation for his termination was pretextual. Defendant has not shown that the verdict in favor of the plaintiff on his reverse gender discrimination claim is "not based on substantial evidence," and, therefore the court must deny defendant's motion for a new trial on the basis of insufficiency of evidence. Furthermore, because the court has ruled that the plaintiff failed to present any evidence to support the allegation that defendant acted with malice or willful disregard of his federally protected rights and granted defendant judgment as a matter of law on this issue, defendant's motion for new trial on plaintiff's punitive damages claim is denied as moot.

#### 5. Back Pay Award Reduction

In the event the court does not vacate the back pay award of $8,063 in its entirety, defendant requests that it partially vacate it to "give credit for years in which plaintiff made more money than his presumed salary" with the defendant.[110] While recognizing that the Tenth Circuit has upheld the use of a periodic method of calculating back pay, defendant argues that the court should use the "aggregate"

method because the plaintiff did not object to such calculation. Under its proposed "aggregate" method defendant urges the court to, in a sense, give credit to the defendant for the years in which the plaintiff's actual income at Venator Group was higher than his hypothetical income with the defendant without doing the global calculation already rejected by the court.

The trial court is given wide discretion in calculating back pay. In its July 23, 2003 order the court rejected the "aggregate" method of calculating back pay because it did not fairly compensate the plaintiff for the time he was unemployed following his termination by the defendant. Defendant now attempts to use a modified version of the aggregate method as a collateral attack on the court's back pay award. Defendant does not cite any precedent to support its unusual calculation method, nor does it explain why the plaintiff's award should be reduced as a result of having obtained a higher paying job after suffering unemployment for several months. If the plaintiff had not been fired by the defendant on April 13, 2000, he would have earned $7,662 more in calendar year 2000 and $401 more in calendar year 2002 than he did working for his new employer, the Venator Group. The fact that he earned more money in calendar years 2001 and 2003 does not make the plaintiff whole. The court finds that the plaintiff should be compensated for the losses he sustained in 2000 and 2002 independent of his 2001 and 2003 earnings. Defendant's motion for a reduction in the back pay award pursuant to Fed.R.Civ.P. 59(e) is therefore denied.

---

the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand, except perhaps where the departure is from a constitutional norm or a specific command of Congress.").

110. Defendant's Memorandum in Support of Defendant Kansas Farm Bureau Services' Motion Pursuant to Rules 50 and 59 of the Federal Rules of Civil Procedure, p. 31. (Doc. 127).

**THEREFORE, IT IS ORDERED** that defendant's motion for judgment as a matter of law is **GRANTED IN PART** and **DENIED IN PART.**

**IT IS FURTHER ORDERED** that defendant's motion for a new trial is **DENIED.**

**IT IS FURTHER ORDERED** that plaintiff's award of pecuniary damages is reduced to $800.

**IT IS FURTHER ORDERED** that plaintiff's award of punitive damages is vacated.